The STATE of Ohio, Appellee,

v.

WHISENANT, Appellant.

[Cite as *State v. Whisenant* (1998), 127 Ohio App.3d 75.]

Court of Appeals of Ohio,
Eleventh District, Portage County.

No. 95–P–0112.

Decided March 30, 1998:

**78**

*Victor V. Vigluicci*, Portage County Prosecuting Attorney, and *Marrett W. Hanna*, Assistant Prosecuting Attorney, for appellee.

*Michael A. Partlow*, for appellant.

---

NADER, Judge.

Appellant, Jemmie Lee Whisenant, Jr., appeals his conviction on two counts of aggravated murder with kidnapping specifications in the Portage County Court of Common Pleas for his purposeful killing of Nevada Lynn Davis on January 11, 1995. The events surrounding the murder were revealed in a jury trial.

On the evening of January 11, 1995, appellant, age fifteen, was in his family's mobile home with his sister, Keonna Whisenant, age seventeen, and her child. His father, James Whisenant, Sr. was working. Whisenant, Sr.'s live-in girl-friend, Nevada Lynn Davis, was out shopping. At approximately 8:00 to 8:30 p.m., appellant was alone in his sister's bedroom, at the front of the mobile home, listening to music, when he saw car headlights coming in the driveway, which he believed were those of Davis's car. At the moment he saw the reflection of the headlights, appellant decided he was "going to kill the bitch." Appellant and Davis had a history of interpersonal difficulties to the extent that he did not want to continue living with his father and Davis.

Appellant left his sister's bedroom, went down the hall past his bedroom and a bathroom and through the living room, and went into the kitchen. He selected a knife from one of the kitchen drawers and left the mobile home from a side door located in a utility room.[1]

Appellant traveled almost the entire length of the mobile home, rounded the front, and crept up behind Davis, who was climbing the stairs with her arms full of groceries. He grabbed Davis from behind and cut her throat with the knife he had selected from the kitchen. Davis did not die from this wound. In fact, she attempted to escape from appellant, but he slammed her into the ground, climbed on her back, and stabbed her in the neck. Davis, weakened but alive and conscious, pleaded with appellant to call an ambulance, but he refused her request. Instead, appellant forced her inside the mobile home, into the bath-room, and ordered her to lean over the bathtub so her blood could wash down the drain.

---

1. The outside door from the utility room was located on the opposite side from the main entrance to the mobile home. The dimensions of the mobile home were approximately sixteen feet by eighty feet.

Over the next two hours, Davis pleaded for her life while appellant repeatedly cut her with the knife. When she did not die from the knife wounds, appellant attempted to suffocate her, but was unsuccessful. Finally, after torturing Davis for two hours despite her pleas, appellant got two shoestrings, tied them together and strangled Davis to death. During this two-hour period in which he tortured Davis, appellant made several phone calls to friends from the bathroom "just to talk."

After Davis died, appellant cleaned the bathroom, washing most of the blood down the bathtub drain. He gathered the knife, the shoestrings, and some clots of blood and placed them in a plastic bag. He then dragged the body outside and laid it on the sidewalk leading to the mobile home.[2] He took items from her purse and scattered the groceries on the sidewalk in an attempt to set a scene of a theft-murder. Appellant then disposed of the plastic bag containing the murder weapons and clotted blood by stashing it in a sapling in a nearby stand of trees. Neither appellant nor his sister, who was home during the entire incident, reported the dead body to the police. The record does not contain any evidence that Whisenant, Sr., was home during the attack.

The next morning at approximately 7:00 a.m., a neighbor, Nicole Giertz, discovered the body lying facedown at the base of the stairs to the Whisenant mobile home. She went inside the Whisenant home and reported what she saw to appellant and his sister, who called the police; Giertz did not indicate whether Whisenant, Sr., was in the mobile home when she discovered the body. When the sheriff and the coroner arrived, the body was turned over to reveal the knife wounds, leaving no doubt that Davis's death was not an accident.[3] Also viewed on Davis's body were defensive wounds and strands of hair on her hands. One of the detectives discovered what appeared to be droplets of blood on the threshold of the doorway.

After it became clear that he was dealing with a homicide, Portage County Sheriff Duane Kaley began questioning the family members. He entered the mobile home where Whisenant, Sr., Keonna Whisenant, Nicole Giertz, and appellant were waiting. Sheriff Kaley initially spoke briefly with Whisenant, Sr., and asked him if he could speak with appellant in the master bedroom, at the other end of the mobile home. Sheriff Kaley wanted to speak with appellant

---

**2.** Apparently, appellant's sister assisted him at least in cleaning the crime scene. She was not charged for her role, if any, in Davis's murder and the subsequent cover-up attempt.

**3.** When the body was first discovered, the police were unsure whether they were dealing with an accident or a homicide because the body was found lying facedown. There was an initial theory that Davis may have slipped and fallen on the icy sidewalk or steps. This theory was quickly discarded when her body was turned over.

because he had been home the previous night and his bedroom was located adjacent to the location where Davis's body had been found.

Only Sheriff Kaley, Whisenant, Sr., and appellant were present in the master bedroom. It is not clear whether the door to the room was closed, but, if so, it was not locked. Sheriff Kaley told both Whisenants that Davis did not die as a result of an accident, but was murdered. He also told appellant that he was not under arrest and was free to leave at any time. Sheriff Kaley then asked appellant, "What happened?" To this question appellant responded, "I've had enough and I killed her." Sheriff Kaley ceased all communications at this point so that he could obtain a *Miranda* form. Upon receiving the form, Sheriff Kaley read it to appellant and his father. After each right was read, he inquired of both Whisenants whether they understood, to which each responded affirmatively.

Sheriff Kaley obtained an audiotaped statement from appellant regarding the events of the previous night, including his disposal of the murder weapons. Upon the sheriff's request, appellant led him, Whisenant, Sr., and other deputies to the tree in which he had hidden the evidence and then led them back to the mobile home by the route he had taken the night before. Appellant also showed the sheriff the drawer from which he had taken the knife he used to stab Davis and the clothes he was wearing during the murder. Appellant was then placed under arrest and taken into custody.

A complaint was filed in the juvenile division on January 12, 1995, alleging that appellant was a delinquent child as a result of his violation of R.C. 2903.01(A), the purposeful killing of another with prior calculation and design, an act which would constitute a felony if committed by an adult. On the same date, the court appointed an attorney to represent appellant and ordered appellant to be detained. The state also filed a motion for the juvenile court to relinquish jurisdiction on January 12, 1995. At his arraignment on January 13, 1995, appellant entered a plea of not true, and the court scheduled a Juv.R. 30(A) probable cause hearing.

On January 17, 1995, appellant filed multiple preadjudication motions. These included a motion for appointment of a psychological expert and an investigator, a motion to dismiss the complaint, and a motion to suppress the statements he had made to the police and any evidence arising therefrom. A search warrant was issued for the Whisenant mobile home to permit the state to obtain blood, hair fibers, illicit drugs, and fruits or instruments of the crime. On January 19, 1995, appellant filed two motions to dismiss the state's motion to relinquish jurisdiction, based on different theories, and requested the appointment of a guardian *ad litem*.

On January 20, 1995, the court held the probable cause hearing, pursuant to Juv.R. 30(A), after which it filed its judgment entry, finding that appellant was

over fifteen years of age at the time the crime was committed and that the crime charged (aggravated murder) would be a felony if committed by an adult and finding probable cause to believe that appellant had committed the aggravated murder. The court denied appellant's motions to dismiss, granted his motion to appoint a guardian *ad litem*, but refused to rule on his motion to suppress, concluding that the motion was premature.

On February 3, 1995, the court conducted a hearing to determine whether appellant would waive the mental examination. At the hearing, appellant renewed his request for an independent psychological expert, claiming that one was necessary to assist him in deciding whether to waive the mental examination. Upon denial of his request, appellant orally waived this right before the court. The court filed its judgment entry, formally denying appellant's request for an independent psychologist and concluding that appellant had knowingly and intelligently waived his right to a mental examination.

After many prehearing motions and a lengthy Juv.R. 30(B) bindover hearing, the juvenile court relinquished its jurisdiction over appellant to the general division on March 9, 1995, concluding as follows: (1) appellant was over fifteen years of age when the crime of aggravated murder, an act that would be a felony if committed by an adult, was committed; (2) there was probable cause to believe appellant had committed the aggravated murder; (3) there were reasonable grounds to believe appellant was not amenable to rehabilitation in the juvenile system; and (4) there were reasonable grounds to believe that the safety of society might require appellant to be confined beyond his attaining the age of majority. The judgment entry contained extensive findings regarding all factors to be considered under Juv.R. 30(F).

The Portage County grand jury indicted appellant on two counts of aggravated murder: Count One charged a violation of R.C. 2903.01(A), the purposeful killing of another with prior calculation and design, and Count Two charged a violation of R.C. 2903.01(B), the purposeful killing of another while committing a kidnapping.[4] Each count contained a kidnapping specification. Appellant entered a plea of not guilty to all counts.[5]

---

4. Although it was not raised as an issue in this appeal, we note that the grand jury was within its power to indict appellant for counts that were not alleged in the juvenile proceedings. *State v. Adams* (1982), 69 Ohio St.2d 120, 23 O.O.3d 164, 431 N.E.2d 326, paragraph two of the syllabus ("When a minor is transferred from the Juvenile Court to the Court of Common Pleas on a charge which would constitute a felony if committed by an adult, the grand jury is empowered to return any indictment under the facts submitted to it and is not confined to returning indictments only on charges originally filed in the Juvenile Court").

5. Appellant also entered a plea of not guilty by reason of insanity, but later withdrew that plea after a competency evaluation was conducted.

He renewed his motion to suppress the statements he made to police and any evidence obtained therefrom on *Miranda* grounds. He also moved to suppress any evidence obtained incident to the search warrant, claiming that there was no affidavit supporting the warrant. A hearing on the motions was held on June 26, 1995, at which Sheriff Kaley and Lieutenant John Ristity testified. The court overruled appellant's motions on June 28, 1995.

A jury trial was held on August 7–9, 1995. After the jury was empaneled and sworn, the court permitted the jurors to view the scene of the crime, upon the state's motion and over appellant's objection. The state presented the testimony of Nicole Giertz, several persons to authenticate a scaled drawing and aerial photograph of the Whisenant mobile home, Sheriff Kaley and other members of law enforcement, and two medical examiners. At the close of the state's case, appellant moved for a Crim.R. 29(A) acquittal, which the court denied. Appellant presented no witnesses, closed his case, and renewed his motion for acquittal, which the court denied. A majority of the state's exhibits were accepted into evidence, and, after closing arguments, the jury was charged on the two counts of aggravated murder with kidnapping specifications.

The jury returned a verdict of guilty on both counts and specifications. The court immediately sentenced appellant to life in prison with eligibility for parole in thirty years; the court merged the two counts of aggravated murder for sentencing purposes. The court overruled appellant's motion to set aside the verdict, and appellant timely appealed, raising eight assignments of error:

"1. The juvenile court erred, to the prejudice of the appellant, by failing to consider the admissibility of statements made by the appellant to police authorities and evidence obtained as a direct result of these statements prior to the appellant's 'bind-over' hearing in the Portage County Juvenile Court, in clear violation of the appellant's rights pursuant to the Fifth and Fourteenth Amendments to the Constitution of the United States and Art. I[,] Section 10 of the Constitution of the State of Ohio.

"2. The juvenile court erred and violated the appellant's rights pursuant to the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States and Article I, Section 10 of the Constitution of the State of Ohio by failing to grant the appellant's motion for a court-appointed psychologist in order to assist the appellant in the bind-over proceeding.

"3. The juvenile court erred, and abused its discretion, by denying the appellant's motion for a court-appointed psychological expert.

"4. The juvenile court erred and abused its discretion by determining that the appellant was not amenable to care or rehabilitation in any facility designed for the care, supervision and rehabilitation of delinquent children.

"5. The trial court erred, to the prejudice of the appellant by denying the appellant's motions to suppress the evidence against him, in clear violation of the appellant's rights pursuant to the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 10 of the Constitution of the State of Ohio.

"6. The appellant's conviction for aggravated murder, as is alleged in Count I of the indictment, was not supported by sufficient evidence.

"7. The appellant's conviction for aggravated murder, as alleged in Count II of the indictment[,] was not supported by sufficient evidence.

"8. The appellant's convictions for aggravated murder, as alleged in Counts I and II of the indictment, were against the manifest weight of the evidence."

We begin our analysis by addressing appellant's first and fifth assignments of error together because they are interrelated.

Appellant's first assignment of error challenges a decision, or lack thereof, made by the juvenile court in the bindover proceedings. To fully understand the issue, it is necessary to briefly overview the nature of the bindover proceeding. The juvenile court has original and exclusive jurisdiction over matters relating to allegedly delinquent children. R.C. 2151.26(A)(1).[6] When a juvenile aged fifteen to eighteen commits an offense that would be a felony if committed by an adult, the court will hold a series of hearings[7] to determine whether the court will retain its exclusive jurisdiction over the child or whether it will relinquish jurisdiction to the general division for criminal prosecution. R.C. 2151.26 and Juv.R. 30. The juvenile court's determination to relinquish jurisdiction to the general division is what is meant by the term "bindover." At the first hearing, the court must determine whether there is probable cause to believe that the juvenile, aged fifteen to eighteen, committed the felonious act. Juv.R. 30(A). If the court finds probable cause, a second hearing will be held to determine the juvenile's amenability to rehabilitation in the juvenile system. Juv.R. 30(B). This second determination will be discussed below in our consideration of appellant's fourth assignment of error.

Turning to the merits of the case at hand, appellant first claims that the juvenile court erred in failing to rule on his suppression motion before conducting the bindover proceeding. In support of his position, appellant directs our attention to the Oklahoma case of *J.T.P. v. State* (Okla.Crim.1975), 544 P.2d 1270,

---

**6.** R.C. 2151.26 was amended in 1996, but because the events in question occurred in January 1995, we analyze the issues under the version in effect at that time. 144 Ohio Laws, Part II, 2745.

**7.** The hearings may be upon the motion of the court, the state or the child. Juv.R. 30(A).

in which the Court of Criminal Appeals concluded that at the bindover proceeding, the juvenile court was required to suppress evidence obtained in violation of the juvenile's constitutional rights.

"We hold that it is the duty of the judge of the juvenile court to deny admission into evidence at a certification [*i.e.,* bindover] hearing those statements of a child, obtained in violation of constitutional or statutory rights, which are inadmissible in delinquency or criminal proceedings." *Id.* at 1276.

Other courts have held similarly. *E.g., State v. Flying Horse* (S.D.1990), 455 N.W.2d 605. These courts base their decision on language contained in a case decided by the Supreme Court of the United States, *Kent v. United States* (1966), 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84. In *Kent,* the court addressed the question of which rights a juvenile enjoys at a bindover or certification hearing held to determine whether the juvenile court will retain jurisdiction over him. In concluding that a bindover proceeding must comport with minimum standards of fundamental fairness and due process, *id.* at 553, 86 S.Ct. at 1053, 16 L.Ed.2d at 92–93, the court explained the nature of the bindover proceeding:

"It is clear beyond dispute that the waiver of jurisdiction is a 'critically important' action determining vitally important statutory rights of the juvenile. * * * The Juvenile Court is vested with 'original and exclusive jurisdiction' of the child. This jurisdiction confers special rights and immunities. He is, as specified by the statute, shielded from publicity. He may be confined, but with rare exceptions he may not be jailed along with adults. He may be detained but only until he is 21 years of age. * * * The child is protected against consequences of adult conviction such as the loss of civil rights, the use of adjudication against him in subsequent proceedings, and disqualification for public employment." *Id.* at 556–557, 86 S.Ct. at 1054–1055, 16 L.Ed.2d at 94–95.

The *Kent* court then decided that fundamental fairness and due process require the juvenile court to ensure that the juvenile is given a bindover hearing, although it may be informal, at which he has access to an attorney, who is to be provided with copies of reports the court will consider in ruling on the issue of bindover, and a statement of the reasons for the court's decision to bind the juvenile over to the general division for criminal prosecution. *Id.* at 557, 86 S.Ct. at 1055, 16 L.Ed.2d at 95.[8]

Based upon the court's statement that a certification or bindover proceeding is "critically important" in light of the potentional consequences to the juvenile, the *J.T.P.* court held that the juvenile court may not consider evidence which would

---

8. After the decision in *Kent,* the court held in *In re Gault* (1967), 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527, that juveniles are entitled to Fifth Amendment and *Miranda* rights, although the court did not address the issue in the bindover stage of the proceedings.

be inadmissible in adjudicative settings in determining whether to retain jurisdiction over the juvenile or transfer jurisdiction to the general division.

On the other hand, our research revealed a contrary and more persuasive approach to this issue. In *In re Ralph M.* (1989), 211 Conn. 289, 559 A.2d 179, the Supreme Court of Connecticut was faced with the admissibility of evidence obtained in alleged violation of *Miranda* in a bindover proceeding. The court held that "[statutory and] constitutional questions concerning the admissibility of [a juvenile's] statements raised by the [state], while relevant at a later adjudicatory proceeding, are not appropriate for resolution at a transfer [*i.e.*, bindover] hearing." *Id.* at 314, 559 A.2d at 192. Like *J.T.P*, the *In re Ralph M.* court based its decision on the nature of the bindover proceeding, but came to the conclusion opposite that of the *J.T.P.* court. Although it did recognize the "critically important" nature of the bindover proceeding, it held that because the proceeding is not adjudicative in nature, the admissibility of evidence is not a consideration and is, in fact, improper to be raised. *Id.* at 313, 559 A.2d at 191 ("[i]n fact, the general rule is that constitutional questions are not properly raised in a probable cause hearing because such hearings are not adjudicatory in nature. See, e.g., Fed.R.Crim.Proc. 5.1, Notes of Advisory Committee on Rules; 2 W. LaFave & J. Israel, supra, § 14.4"). The court also analogized the probable cause determination in a bindover proceeding to other probable cause determinations in Connecticut, such as a grand jury proceedings, wherein motions to suppress are forbidden even though the Rules of Evidence apply, according to Connecticut law.[9]

We agree with the approach taken by the Supreme Court of Connecticut in *In re Ralph M.* and conclude that because the bindover proceeding is not adjudicative (the juvenile's guilt or innocence is not at issue), statutory and constitutional questions concerning the admissibility of evidence are premature and need not be addressed. Fundamental fairness and due process are not violated by the juvenile court's failure to rule on or to suppress evidence obtained in alleged violation of *Miranda* in this type of proceeding. Consequently, the juvenile court in this case did not err in refusing to rule on appellant's motion to suppress on *Miranda* grounds.

---

**9.** In Ohio, the Rules of Evidence are not applicable to grand jury proceedings held to determine probable cause to indict a criminal defendant. Evid.R. 101(C)(2). Thus, the grand jury's determination of probable cause is made without regard to the admissibility of evidence. This difference between Connecticut and Ohio law weighs even more heavily in favor of the conclusion reached in *In re Ralph M.* Moreover, the Supreme Court of the United States has held that the exclusionary rule does not apply in grand jury proceedings held to determine probable cause. *United States v. Calandra* (1974), 414 U.S. 338, 344–345, 94 S.Ct. 613, 618–619, 38 L.Ed.2d 561, 569–570.

The first assignment of error is without merit. Even had we concluded that the court was required to rule on the motion, any error would have been harmless because as is to be discussed, there was no *Miranda* violation in this case.

Appellant contends, in his fifth assignment of error, that the trial court erred in overruling his motion to suppress the statements he made to Sheriff Kaley and any evidence obtained from that statement because he claims the statements were obtained in violation of his *Miranda* rights. Although he asserts other arguments in support of his contention, appellant focuses primarily upon the role his father played in his confession. He maintains in his appellate brief that his father "took absolutely no efforts to protect [appellant's] rights * * * and * * * apparently had no interest in doing so due to the fact that the victim of the homicide in controversy was involved with * * * Appellant's father."

In reviewing a trial court's decision to overrule a motion to suppress, an appellate court "reviews the record to see if substantial evidence exists to support the trial court's ruling, bearing in mind that the trial court has the function of assessing credibility and weighing evidence." *State v. Estepp* (Nov. 26, 1997), Montgomery App. No. 16279, unreported, 1997 WL 736501, at *2, citing *State v. Brown* (1993), 91 Ohio App.3d 427, 632 N.E.2d 970.

It is well settled that juveniles are entitled to protection from self-incrimination under the Fifth Amendment and are therefore entitled to *Miranda* warnings *where applicable.* *In re Gault* (1967), 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527. It is also axiomatic that a juvenile may waive his Fifth Amendment rights with or without parental consent so long as the totality of the circumstances of the waiver, including the age of the juvenile, shows that the waiver is knowingly, intelligently, and voluntarily made. *Fare v. Michael C.* (1979), 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197; *In re Watson* (1989), 47 Ohio St.3d 86, 89–90, 548 N.E.2d 210, 213–215. With these preliminary precepts in mind, we turn to the merits of appellant's contention.

To fully resolve the *Miranda* issue here, the events surrounding appellant's confession will be considered chronologically. First, appellant stated, "I've had enough and I killed her" in response to Sheriff Kaley's question, "What happened?" This revelation was made prior to any *Miranda* warnings being given.

*Miranda* warnings are necessary only when there is a custodial interrogation. *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 460–461, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 715–716; *State v. Biros* (1997), 78 Ohio St.3d 426, 440, 678 N.E.2d 891, 904 ("[o]nly *custodial* interrogation triggers the need for *Miranda*-warnings." [Emphasis *sic* ] ). The primary inquiry in determining if there is a custodial interrogation is, looking at the totality of the circumstances, whether a

reasonable person would feel free to leave the interview. The determination of what constitutes custody does not depend upon the subjective feelings of the accused or the unarticulated subjective goals of law enforcement. *Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317; *State v. Hopfer* (1996), 112 Ohio App.3d 521, 545–546, 679 N.E.2d 321, 336–337. Rather, the focus is upon the perception a reasonable person would have under the circumstances. *Stansbury v. California* (1994), 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293, citing *Berkemer, supra.*

In this case, appellant was in the master bedroom of the family mobile home with his father and Sheriff Kaley when he uttered the incriminating statement "I've had enough and I killed her." The testimony reveals that Sheriff Kaley, who was in plain clothes, ushered appellant and his father into the room. It is not clear whether the door was closed, but Sheriff Kaley testified that the door was not locked. Before asking any questions, the sheriff in initiating his inquiry told appellant that he believed that Davis had been murdered, but also told appellant he was not under arrest and was free to leave at any time. Under these circumstances, a reasonable person would not have felt that he was not at liberty to terminate the discussion and leave. See *State v. Walker* (Sept. 16, 1997), Franklin App. No. 97APA02–212, unreported, 1997 WL 578946, at *3 (holding that the defendant was not in custody when he was interviewed in his home), and *In re Bucy* (Nov. 6, 1996), Wayne App. No. 96CA0019, unreported, 1996 WL 640039, at *2 (holding that the juvenile was not in custody when he was questioned in an unlocked school room and was told he was not under arrest and was free to leave). Thus, *Miranda* warnings were not necessary when appellant made his first incriminating statement, "I've had enough and I killed her."

After appellant made this statement, Sheriff Kaley terminated the discussion and read both appellant and his father the litany of *Miranda* rights. After each right was read, both appellant and his father were asked if they understood them, to which each responded affirmatively. Then appellant gave a detailed statement and led Sheriff Kaley to crucial evidence of the murder. Appellant claims that he did not knowingly and intelligently waive his Fifth Amendment or *Miranda* rights.

The state carries the burden to prove the voluntariness of a confession, *i.e.*, an effective *Miranda* waiver, by a preponderance of the evidence. *State v. Gumm* (1995), 73 Ohio St.3d 413, 429, 653 N.E.2d 253, 268. To determine whether a defendant knowingly and intelligently waived his *Miranda* rights, "the court should consider the *totality* of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." (Emphasis *sic.*) *State v. Edwards*

(1976), 49 Ohio St.2d 31, 40–41, 3 O.O.3d 18, 23–24, 358 N.E.2d 1051, 1059. See, also, *State v. Dennis* (1997), 79 Ohio St.3d 421, 425, 683 N.E.2d 1096, 1101–1102, and *State v. Smith* (1991), 61 Ohio St.3d 284, 288, 574 N.E.2d 510, 515.

■ The Supreme Court of Ohio has rejected the "independent advice/interested adult" standard adopted in some states that requires that both the child and his or her parent(s) waive the minor's constitutional rights before the child makes a statement to police. *State v. Bell* (1976), 48 Ohio St.2d 270, 276–277, 2 O.O.3d 427, 430–431, 358 N.E.2d 556, 561–562; and *In re Watson*, 47 Ohio St.3d at 89–90, 548 N.E.2d at 213–215. Rather, parental presence and acquiescence are only two factors in the totality of circumstances surrounding the statement. *In re Lee* (Dec. 17, 1992), Cuyahoga App. No. 63858, unreported, 1992 WL 390193, at *5, citing *State v. Bobo* (1989), 65 Ohio App.3d 685, 585 N.E.2d 429.

■ Returning to the facts of this case, appellant was read his *Miranda* rights by Sheriff Kaley in his father's bedroom and in his father's presence. Although he claims that his father was not concerned with protecting his interests, there is nothing on the record that leads us to conclude that Whisenant, Sr., acted in any way contrary to appellant's interests. Moreover, appellant had a somewhat lengthy juvenile history that left him familiar with the events surrounding a police investigation and arrest. Sheriff Kaley testified that appellant seemed to have no problems comprehending their discussion. There was no evidence that appellant suffered from a physical, mental, or emotional incapacity or was in any way unable to intelligently waive his rights. Appellant stated that he understood his rights and chose, in his father's presence, to make a statement. Finally, there appears no evidence of threat, coercion, or intimidation in obtaining appellant's confession. Based on the totality of these circumstances, the trial court could reasonably find a voluntary waiver of appellant's Fifth Amendment rights.[10]

Based on the foregoing, we conclude that there is substantial evidence in the record to support the trial court's decision to overrule appellant's motion to suppress. The fifth assignment of error is without merit.

■ By his second and third assignments of error, appellant maintains that the juvenile court erred and abused its discretion in refusing to appoint an independent psychologist to assist him in the bindover proceedings. His argument to the juvenile court and to this court is the same: an independent psychologist was necessary to determine whether appellant should submit to or waive the Juv.R. 30 mental examination. He claims that the court's failure to appoint the

---

**10.** The fact that Sheriff Kaley failed to obtain a *written* waiver does not dilute the validity of the waiver. *State v. Davie* (1997), 80 Ohio St.3d 311, 320, 686 N.E.2d 245, 256–257; *State v. Weaver* (Mar. 26, 1993), Lake App. No. 92–L–046, unreported, at 9, 1993 WL 130096.

psychologist denied him his right to due process (affluent defendants are able to have independent psychologists), his right to remain silent (anything a defendant would tell a court-appointed psychologist could be used against him in the bindover proceedings) and his right to the effective assistance of counsel (counsel is placed in a Catch 22 in advising a defendant whether to waive the mental exam).

The same arguments appellant brings in this case were raised before this court in *State ex rel. A Juvenile v. Hoose* (1988), 43 Ohio App.3d 109, 539 N.E.2d 704, in the context of a petition for a writ of mandamus. The juvenile in *Hoose* sought the writ to compel the juvenile court in Lake County to appoint an independent psychologist to assist him in determining whether to submit to or waive the Juv.R. 30 mental examination. We rejected the petitioner's arguments and concluded that a juvenile is not entitled to a writ of mandamus compelling the juvenile court to appoint an independent psychologist.

Appellant urges that (1) *Hoose* is distinguishable from this case due to the fact that the juvenile was seeking a writ of mandamus, and (2) we should reexamine *Hoose* because the protections against self-incrimination cited in *Hoose* do not apply in this case. True, *Hoose* is technically distinguishable from the instant case, but we fail to see any significant difference between *Hoose* and this case that would cause us to reexamine the issues presented and reverse our decision in that case. Moreover, although this was not argued by the parties, we take this opportunity to contrast our decision in *Hoose* with our recent decision in *State v. Gotham* (Dec. 31, 1997), Trumbull App. No. 96–T–5485, unreported, 1997 WL 837550, wherein we addressed the issue of the appointment of expert witnesses in the adult criminal context. In *Gotham*, we concluded that the trial court erred in refusing to appoint the indigent defendant an independent expert to assist him in his criminal trial. Aside from the obvious difference in the nature of the proceedings, *Gotham* is distinguishable from *Hoose* (and this case) in one important respect. The *Gotham* defendant requested the appointment of independent experts to assist him in understanding the evidence and disproving the charges against him in the adjudicative portion of the proceedings wherein his guilt or innocence was to be determined. Conversely, the appellant in *Hoose* requested the appointment of independent experts to assist him in determining whether to waive his right to a mental examination under Juv.R. 30 in the bindover proceeding that was not adjudicative in nature; the purpose of the bindover proceeding was not to determine whether he committed the crime, but whether the juvenile court would retain jurisdiction over him. The differences between these two cases lead us to conclude that our decision in *Hoose* has continuing validity in bindover proceedings and we need not reverse or modify it based on *Gotham*. Thus, we reaffirm our conclusion in *Hoose* that a juvenile is

not entitled to a court-appointed independent psychologist to assist him in determining whether to submit to or waive a Juv.R. 30 mental examination. We also conclude that the trial court, in this case, did not abuse its discretion in refusing to appoint one.

Appellant's second and third assignments of error lack merit.

■ For his fourth assignment of error, appellant claims that the juvenile court erred in concluding that he was not amenable to rehabilitation in the juvenile system.[11]

Former R.C. 2151.26 and Juv.R. 30 supply the procedures to be followed in relinquishing the juvenile court's exclusive jurisdiction over a minor to the general division for prosecution as an adult offender. R.C. 2151.26(A) provides that if the juvenile court finds that the following criteria exist, it may, in its discretion, bind over a juvenile for prosecution as an adult: (1) the child was fifteen years of age or older at the time of the commission of an act that would constitute a felony if committed by an adult, (2) there is probable cause to believe that the child committed the act allegedly committed, (3) there are reasonable grounds to believe that the child is not amenable to care or rehabilitation in the juvenile system, and (4) there are reasonable grounds to believe that the safety of the community may require that the juvenile be confined beyond his twenty-first birthday. Juv.R. 30 contains similar requirements and provides factors that the juvenile court must consider in determining whether the juvenile is amenable to rehabilitation in the juvenile system: (1) the child's age and mental and physical condition, (2) the child's prior juvenile record, (3) previous efforts to rehabilitate the child, (4) the child's family environment, (5) the child's school record, and (6) the specific facts of the offense for which probable cause was found. Juv.R. 30(F). These factors need not all be resolved against the juvenile before a bindover is permitted. *State v. Douglas* (1985), 20 Ohio St.3d 34, 37, 20 OBR 282, 284–285, 485 N.E.2d 711, 713, citing *State v. Oviedo* (1982), 5 Ohio App.3d 168, 5 OBR 351, 450 N.E.2d 700.

In reviewing a juvenile court's determination to relinquish jurisdiction under R.C. 2151.26, an appellate court must grant the court wide latitude.

"(1.) A hearing under R.C. 2151.26 is a preliminary stage of the juvenile process and contemplates that the court should have considerable latitude within which to determine whether it should retain jurisdiction.

---

**11.** A decision to bind a juvenile over must be attacked in a direct appeal after conviction because a bindover order is not a final appealable order. *In re Becker* (1974), 39 Ohio St.2d 84, 87, 68 O.O.2d 50, 52, 314 N.E.2d 158, 159–160.

"(2.) What constitutes 'reasonable grounds' for relinquishing jurisdiction under R.C. 2151.26(A)(3) is within the sound discretion of the court, after an 'investigation' is made." *State v. Carmichael* (1973), 35 Ohio St.2d 1, 64 O.O.2d 1, 298 N.E.2d 568, paragraphs one and two of the syllabus.

The Second Appellate District stated in *Hopfer,* 112 Ohio App.3d at 536, 679 N.E.2d at 330, that "any evidence that reasonably supports the juvenile court's decision to relinquish jurisdiction will suffice to sustain that court's judgment."

The juvenile court in this case conducted an extensive hearing on the issues mandated by R.C. 2151.26(A) and Juv.R. 30, during which it received evidence of appellant's juvenile record (several previous adjudications of delinquency), appellant's school record (several suspensions and expulsions), appellant's dysfunctional family system, and the specific facts of this case. No specific inquiry was made into appellant's mental condition due to his waiver of the mental examination, but a physical examination was conducted. The judgment entry contained detailed findings regarding all of the factors listed in Juv.R. 30(F), although the court was not required to make written findings on them, *Douglas,* 20 Ohio St.3d at 36, 20 OBR at 284, 485 N.E.2d at 712, fn. 2.

Appellant contends that the court placed too much emphasis on the specific, gruesome facts of the murder, to the exclusion of more relevant facts. However, the facts of the crime charged are pertinent in determining whether the juvenile is amenable to rehabilitation because they may contain revelations regarding his mental condition. *State v. Watson* (1989), 47 Ohio St.3d 93, 96, 547 N.E.2d 1181, 1184–1185; *Hopfer,* 112 Ohio App.3d at 536, 679 N.E.2d at 330; *State v. Campbell* (1991), 74 Ohio App.3d 352, 357, 598 N.E.2d 1244, 1247–1248. Additionally, there is nothing in the record that suggests that the court considered only the seriousness of the crime. In fact, the court made extensive findings on *all* factors required to be considered by Juv.R. 30(F).

Appellant also claims that prior attempts to rehabilitate him in the juvenile system were limited to probation; he was never placed in the Department of Youth Services ("DYS"). However, there is no requirement that a juvenile first be committed to the DYS before he may be transferred to the general division for trial as an adult offender.

The record before the juvenile court and this court contains sufficient, credible evidence pertaining to each factor listed in Juv.R. 30(F) to support the court's judgment that there are reasonable grounds to believe that appellant is not amenable to rehabilitation in the juvenile court. We find no abuse of discretion in the court's decision to bind appellant over to the general division.

Appellant's fourth assignment of error is not well taken.

For his sixth and seventh assignments of error, appellant challenges his conviction on the two counts of aggravated murder on sufficiency grounds.

■ A contention that a conviction is not supported by sufficient evidence requires an inquiry into whether the state presented evidence on each element of the crime charged which, if believed, would allow the matter to go to the jury. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546.

"The test for sufficiency of the evidence is whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence." (Internal quotation marks and citations omitted.) *State v. Schlee* (Dec. 23, 1994), Lake App. No. 93–L–082, at 10, 1994 WL 738452.

■ Appellant first challenges his conviction on Count I, a violation of R.C. 2903.01(A), the purposeful killing of another with prior calculation and design. He correctly argues that the element of prior calculation and design is more stringent than the prior element of premeditation. *State v. Taylor* (1997), 78 Ohio St.3d 15, 19, 676 N.E.2d 82, 88–89. In *Taylor*, the Supreme Court of Ohio reviewed the origin of the phrase "prior calculation and design" and restated its interpretation of it:

" '[T]he phrase "prior calculation and design" [was employed] to indicate studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim. Neither the degree of care nor the length of time * * * are critical factors in themselves, but they must amount to more than momentary deliberation.' [Legislative Service Commission Comment to 1972 Am.Sub.H.B. No. 511.]

" * * * The General Assembly's apparent intention 'was to require more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill.' [*State v. Cotton* (1978), 56 Ohio St.2d 8, 11, 10 O.O.3d 4, 6, 381 N.E.2d 190, 193]. Also in *Cotton*, at paragraph two of the syllabus, we held that '[i]nstantaneous deliberation is not sufficient to constitute "prior calculation and design." ' " *Taylor*, 78 Ohio St.3d at 19, 676 N.E.2d at 88–89.

The *Taylor* court also appeared to adopt a factors test established in *State v. Jenkins* (1976), 48 Ohio App.2d 99, 102, 2 O.O.3d 73, 75, 355 N.E.2d 825, 828, to determine whether prior calculation and design exists: "(1) Did the accused and the victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder

site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events'?" *Taylor*, 78 Ohio St. 3d at 19, 676 N.E.2d at 89,

In *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, the Supreme Court concluded that the defendant acted with prior calculation and design when, after a botched forgery attempt, he wrestled a gun from a police officer, fired shots at pursuing police and returned to the scene to kill an officer he had already wounded as the officer attempted to crawl away. In *State v. Bailey* (1992), 90 Ohio App.3d 58, 627 N.E.2d 1078, this court concluded that the defendant killed his parents with prior calculation and design when, upon arriving home at 11:30 p.m., he obtained and loaded a gun, went into his parents' bedroom and shot them while they slept. The fact that the defendant had stared at the murder weapon and then at his parents for a short period of time before firing led us to conclude the trial court erred in entering judgment in the defendant's favor. Finally, in *State v. Perry* (Aug. 29, 1997), Trumbull App. No. 94–T–5165, unreported, 1997 WL 590789, we affirmed the defendant's conviction of aggravated murder under R.C. 2903.01(A)(1) when, during a lovemaking episode, he beat his wife to death with a bed slat after she called out the name of another man.

This case presents a much stronger argument for prior calculation and design than *Cotton, Bailey,* and *Perry*. Here, appellant and Davis were residing in the same mobile home and had a history of disagreements and heated arguments. Appellant claimed that he had "had enough" of Davis and wanted to get away from her. On the night of the murder, appellant made a conscious decision that he was "going to kill the bitch." He then took affirmative steps to select a weapon and creep up behind her so she would not be alerted to his presence. When the initial cut to her throat did not kill Davis, appellant forced her into the mobile home, where he tortured, stabbed, suffocated, and ultimately strangled her until she perished. All of these facts tended to establish the element of prior calculation and design and were more than sufficient to send the question of appellant's guilt on Count I to the jury for deliberation. The fact that the state may have used the term "premeditation" during closing argument does not militate against this conclusion, because the court gave the jury an instruction on prior calculation and design, which we presume the jury followed, *State v. Davie* (1997), 80 Ohio St.3d 311, 317, 686 N.E.2d 245, 254–255, and the jury likely did not attach any contrary significance to the state's use of the term "premeditation."

Appellant's sixth assignment of error lacks merit.

██ Appellant also challenges the sufficiency of the evidence to support his conviction on Count II, the purposeful killing of another during the commission of

a kidnapping, a violation of R.C. 2903.01(B). The crime of kidnapping is defined in R.C. 2905.01, which provides:

"(A) No person, by force, threat or deception * * * shall remove another from the place where he is found or restrain him of his liberty, for any of the following purposes:

"* * *

"(2) To facilitate the commission of any felony or flight thereafter;

"(3) To terrorize, or inflict serious physical harm on the victim or another."[12]

Appellant's argument focuses on the state's failure to present evidence of appellant's "exertion of control [beyond that] normally associated with a homicide" to support a kidnapping charge. Appellant's reliance upon this theory is misplaced. Appellant was not charged with kidnapping *and* aggravated murder. He was charged with aggravated murder with a predicate offense of kidnapping. Appellant's contention is more appropriately directed toward the concepts of lesser included offenses and allied offenses of similar import, rather than whether the state presented sufficient evidence regarding the predicate offense of kidnapping to support the conviction for aggravated murder.

The state presented evidence that appellant forced Davis into the mobile home after his initial unsuccessful attempt to murder her on the front porch. Moreover, evidence was presented that appellant confined Davis to the bathroom for a two-hour period and inflicted serious physical harm upon her, despite her desperate pleas for mercy, until he ultimately strangled her to death. From this evidence, the jury could reasonably conclude appellant asported Davis from the place in which he found her and restrained her mobility for the purpose of committing a named felony (murdering her) and for the purpose of torturing and inflicting serious physical harm upon her. Thus, appellant's conviction was supported by sufficient evidence, and his seventh assignment of error is without merit.

 For his final assignment of error, appellant challenges his conviction on both counts of aggravated murder as being against the manifest weight of the evidence.

---

12. The jury was instructed on both purposes for kidnapping—to commit a felony and to inflict serious harm upon the victim. No special interrogatories were submitted to help ascertain which subsection the jury relied upon for this conviction. Therefore, we will analyze appellant's conviction under both sections.

Unlike a sufficiency challenge, a manifest-weight challenge involves an inquiry into whether the jury, in analyzing the evidence and resolving factual conflicts, clearly lost its way in convicting the defendant. *Thompkins, supra.* We concluded in our discussion of appellant's sixth assignment of error that there was more than sufficient evidence to send the question of appellant's guilt on Count I of the indictment to the jury. Likewise, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice in finding appellant guilty of aggravated murder under Count I for purposefully causing the death of Davis with prior calculation and design. Appellant conceived a plan to murder Davis borne of his extreme dislike of her and implemented that plan with cold and calculating cruelty. His conviction on Count I was amply supported by the evidence, and the jury correctly so concluded.

Relating to Count II, purposefully causing Davis's death while committing a kidnapping, we also conclude that the jury did not create a manifest miscarriage of justice in finding appellant guilty on this count. Again, the evidence clearly established that appellant removed Davis from the front porch and confined her to the bathroom in the mobile home for the purpose of completing his malicious plot to torture and murder her. The jury correctly found appellant guilty on Count II.

Appellant's eighth assignment of error is overruled.

In accordance with the foregoing, the judgment of conviction and sentence of the Portage County Court of Common Pleas on the jury's verdict of guilty is affirmed.

*Judgment affirmed.*

FORD, P.J., and CHRISTLEY, J., concur.