OPINION
Appellant, Thomas Maxwell, appeals from his conviction in the Lake County Court of Common Pleas on one count of felony DUI in violation of R.C. 4511.19. The following facts are relevant to a determination of this appeal.
Appellant has worked as a transmission re-builder for Eastlake Engine and Transmission since 1992. Appellant suffered from a heroin addiction, in addition to vertigo and various knee ailments. In early 1998, he attempted to cure himself of his heroin addiction without professional help. As expected from someone going through heroin withdrawal, appellant developed severe flu-like symptoms including loss of appetite, nausea, and insomnia. His employer, the owner of Eastlake Engine and Transmission, Susan Bertram, took it upon herself to help appellant in any way she could, including buying him clothes, bringing him food, paying his bills, and encouraging him to stop using heroin. During his attempt to quit his addiction, appellant lost a large amount of weight, would regularly fall asleep while on the job and generally appeared "run-down and haggard." Finally, in April 1998, appellant was admitted into a methadone maintenance program at a clinic in downtown Cleveland.
Methadone is an opiate, a member of the family of drugs which includes heroin, codeine, and morphine. It is commonly used in treating people who have a heroin addiction as it tricks the brain into thinking that the much more dangerous heroin has been ingested. Thus, it alleviates the craving and eliminates the symptoms associated with heroin withdrawal.
After appellant began participating in the methadone maintenance program, Mrs. Bertram noticed significant improvement in his work performance and his health in general. Particularly, in a three-to-four hour window immediately after receiving his methadone treatment in mid-morning, appellant was able to function quite effectively before becoming lethargic late in the afternoon. In fact, Mrs. Bertram would often have appellant stop and pick up parts needed for the business on his way back to work from his treatments in Cleveland.
On the morning of June 1, 1998, appellant arrived at work "very, very shaky" and looking tired with "a yellow cast to his skin" according to Mrs. Bertram. She stated that this was typical for appellant's appearance prior to receiving his methadone treatment. He left the shop at approximately 10:00 a.m. to go for his daily treatment. Mrs. Bertram also instructed him to pick up parts at Cleveland Transmission Supply in downtown Cleveland on his way back to the shop following his methadone treatment.
On his way back to work, shortly before noon, appellant was seen driving erratically by someone who notified the police. Officer Brian Lako of the Wickliffe Police Department spotted appellant's vehicle and began following it on East 305th Street. Officer Lako witnessed appellant's vehicle weaving, crossing over the double yellow centerline, and jumping the curb on the right-hand side of the road, narrowly missing a road sign. Appellant was also exceeding the posted speed limit. Based upon these observations, Officer Lako initiated a traffic stop of appellant. Officer Lako was joined by Officers John Malady and Jeffery Mastroianni of the Willowick Police Department as the stop occurred just over the border from Wickliffe, in Willowick.
Officer Malady claimed that appellant "seemed a little slow. A little lethargic. Kind of awkward, kind of out of it, kind of spacey. Kind of two steps behind the rest of the world." There was, however, no odor of alcohol coming from appellant, and he was fully cooperative. Officer Malady thought that perhaps appellant was under the influence of some type of drug. Appellant was asked to step out of his car and perform a number of field sobriety tests. According to Officer Malady, appellant failed the "heel to toe" test, the "one foot balancing" test, and the "finger to nose" test. This led to appellant's arrest for DUI.
Appellant was placed in the back seat of Officer Malady's police car and asked if he would consent to a blood test. Appellant refused and told the officer that he had just received his 60-milligram dose of methadone one-half hour earlier as part of his treatment program which would have inevitably shown up in his system. He also explained that he had not been sleeping well and had only been able to get three hours of sleep the previous night. Appellant was taken to the Willowick Police Station where he was again asked to perform certain field sobriety tests which were videotaped.
Appellant was subsequently charged with one count of felony DUI pursuant to R.C. 4511.19 and 4511.99(A)(4)(a), since he had three prior DUI convictions. After entering a plea of not guilty, the matter proceeded to a jury trial commencing February 2, 1999. On February 4, 1999, the jury returned a guilty verdict. Appellant was sentenced on March 15, 1999, and an amended judgment entry of sentence was filed by the trial court on May 19, 1999. Appellant was sentenced to two years of community control, with the first sixty days to be spent in the Lake County Jail. He was fined $750, and his operator's license was suspended for three years. Finally, his automobile was forfeited to the Willowick Police Department.
Appellant timely filed a notice of appeal and has now set forth the following assignments of error:
 "1. The verdict is against the manifest weight of the evidence.
 "2. The trial court abused its discretion when it refused to give Defendant's proposed jury instructions regarding the definition of the term `under the influence' and the weighing of direct and circumstantial evidence.
 "3. The trial court's decision to allow the State to introduce evidence of Defendant's three prior DUI convictions violated Defendant's right to due process.
 "4. R.C. Section 4511.19 and 4511.99(A)(4)(a) are unconstitutional to the extent that they usurp the judiciary's power to determine the admissibility of evidence."
 In the first assignment of error, appellant contends that the jury's verdict was against the manifest weight of the evidence. However, in his brief, he implicitly challenges the sufficiency of the evidence for his felony DUI conviction. The Supreme Court of Ohio has clarified the distinction in the analysis between a claim of manifest weight of the evidence and sufficiency of the evidence. Regarding sufficiency of the evidence, the court stated that such analysis requires an inquiry into whether the state presented evidence of each element of the crime charged which, if believed, would allow the matter to go to the jury. Sufficiency is a test of adequacy. State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
This court has held:
 "`The test for sufficiency of the evidence is whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence.' (Internal quotation marks and citations omitted.) State v. Schlee (Dec. 23, 1994), Lake App. No. 93-L-082, at 10, 1994 WL 738452." State v. Whisenant (1998), 127 Ohio App.3d 75, 92.
 With that standard in mind, we will review the present case. Appellant was convicted of violating R.C. 4511.19, which provides, in relevant part:
 "(A) No person shall operate any vehicle * * * within this state, if any of the following apply:
 "(1) The person is under the influence of alcohol, a drug of abuse, or alcohol and a drug of abuse; * * *"
 Further, since appellant was charged with felony DUI, the state had to prove that appellant had three or more prior convictions for DUI within six years of the offense. R.C. 4511.99(A)(4)(a).
We begin our analysis with the following undisputed facts. Appellant was operating his vehicle in a manner such that it was more than reasonable for the police to stop him. He was speeding, and weaving all over the road and even off the road. Appellant also performed poorly on the field sobriety tests according to the police. Furthermore, there is no question but that appellant had taken a certain amount of methadone approximately one-half hour prior to the aforementioned stop. The key question that needs to be answered is whether the methadone was responsible for causing appellant's poor driving.
The fact that one has taken a drug such as methadone and then is soon thereafter stopped for erratic driving is simply not enough to support a DUI conviction. There must be a nexus between the two events. As the trial court properly explained in its jury instruction:
 "Under the influence means that a defendant had within his body a drug of abuse, whether mild or potent, in such a quantity, whether small or great, that it adversely affected and appreciably impaired the Defendant's actions, reactions or mental processes under the circumstances then existing and deprived him of that clearness of intellect and control of himself that he would otherwise have possessed. The question is not how much a drug of abuse would affect an ordinary person. The question is what effect did any drug of abuse consumed by the Defendant have on him at the time and place involved. If the ingestion of a drug of abuse so affected the nervous system, brain, or muscles of the Defendant so as to impair, to an appreciable degree, his ability to operate the vehicle, then the Defendant was under the influence. Appreciable means noticeable or perceptible."
 This statement of the law is consistent with both the Ohio Jury Instructions and the holdings of numerous Ohio courts. State v. Bakst (1986), 30 Ohio App.3d 141, 145; Toledo v. Starks (1971), 25 Ohio App.2d 162, 166; and State v. Steele (1952), 95 Ohio App. 107, 111.
In the present case, the only evidence that was presented on this issue came from each side's expert witness. The state's expert, Lauren Vinsick, was employed as a forensic toxicologist at the Lake County Regional Forensic Lab for approximately nine months. Her educational background consisted of a bachelor's degree from Ashland University, and attendance at a number of seminars. She testified that she was familiar with methadone and stated that its effects included producing a euphoric state. It could, at certain doses, cause someone to become disoriented, weak, and "kind of lethargic."
During cross-examination, however, she admitted that a person who takes methadone on a regular basis would build up a tolerance to it and would not be affected to the same extent as someone using it on an infrequent basis. She also was unable to state what dosage level would be necessary to cause the results that she mentioned during direct examination. She could not state whether 60 milligrams was a high or low dose, and she had no familiarity with methadone clinics such as the one treating appellant. She also admitted that as far as a treatment for heroin, the sooner a person takes methadone, the sooner that person is able to function at a normal level. Finally, Ms. Vinsick was asked:
 "Can you state with any degree of scientific certainty whether any dose at all has any dose of methadone at all, has any affect on [appellant], any of the effects that you spoke of? Euphoric or loss of concentration or drowsiness or anything else that you said, can you state that to a scientific certainty?"
Vinsick answered "[n]o."
Appellant presented the testimony of Robert J. Belloto, Jr. Ph.D. Dr. Belloto was a pharmacist and Assistant Professor of Pharmacology at the University of Toledo. He had a bachelor's degree in pharmacy, a master's degree in pharmacy, and a doctorate in chemistry, division of pharmacology, all from the Ohio State University. Dr. Belloto testified unequivocally that methadone is not an impairing drug at the dosage level that appellant was taking. In fact, it would take a near-fatal dose of methadone for someone who had not built up a tolerance to the drug to experience any type of euphoria or "high." Moreover, that euphoria would only last a few minutes. Appellant, as a former heroin user and now in the methadone treatment program would have built up a tolerance to methadone and would clearly not be impaired by the dosage he was taking. Dr. Belloto was then posed the following question:
 "Doctor, at maintained doses of 55 milligrams, between 55 to 65 milligrams, if a person was in a methadone maintenance program, would a dose of that amount be likely, to reasonable degree of scientific certainty, cause either mental or physical impairment?"
The doctor responded, "[n]o, it would not."
Subsequently, during cross-examination, the following exchange occurred:
 "Q. If we have a person who is exhibiting signs of stupor, lack of muscle coordination, disorientation, things of that nature, poor eye hand coordination, is that consistent with an amount of methadone given in a hospital?
"A. That could be consistent with lack of sleep.
 "Q. But it could be I am asking you whether or not it would be consistent with an amount, dosage, given by the methadone treatment center?
 "A. For that dosage that he gave, no I don't think so. That wouldn't be consistent at all. That is too low a dose.
 "Q. Mr. Maxwell should not have been exhibiting those symptoms that he was from the methadone?
"Mr. Gardner: Objection.
 "The Court: Overruled. You can answer that if you are able to.
 "A. I would not correlate those symptoms with the methadone. I would correlate them with lack of sleep or something, something else."
 From a review of the testimony of the two experts, the only possible conclusion that can be drawn is that the amount of methadone administered to appellant through the methadone treatment program — 60 milligrams according to what appellant told Officer Malady, which would be consistent with Dr. Belloto's testimony was not anywhere close to being the size dose necessary to cause euphoria, drowsiness, or disorientation. Thus, the problems that appellant experienced in driving his automobile on the morning of June 1, 1998, and in performing the field sobriety tests, could not have been the result of ingesting 60 milligrams of methadone one-half hour earlier.
This conclusion is further supported by the testimony of appellant's employer, Susan Bertram. She reviewed the videotape of appellant performing the field sobriety tests at the Willowick Police Station and testified that appellant seemed to be his usual self and was not acting out of the ordinary, other than the fact that he appeared angry. She explained that he "lives in a different world than the rest of us." He suffered from vertigo which made it impossible for him to tilt his head back and look up without losing balance or becoming nauseous. She explained how he was unable to stand under a car which was up on a lift as a normal transmission mechanic would do. Instead, he had to sit on a bench under the car so he would not become dizzy. Finally, she detailed appellant's problems with insomnia which caused him to fall asleep on the job.
Mrs. Bertram also testified concerning appellant's condition before and after his methadone treatments. She stated that the methadone improved his ability to function and that she could usually count on a three-to-four hour window of opportunity when appellant could function, and perform his required tasks. He had more energy and generally looked better. She often had him run errands on his way back from receiving his treatments. This testimony contradicted the state's theory that appellant was impaired and unable to drive due to his methadone treatment. Instead, all of the evidence suggested that methadone improved his abilities and provided him clarification.
While the defense had no duty to prove that appellant was not driving under the influence of alcohol or a drug of abuse, the defense in the instant cause offered an alternative reason to explain appellant's poor driving. Specifically, appellant claimed that his lack of sleep was the reason he was driving erratically. This explanation drew support from the testimony of Dr. Belloto and Mrs. Bertram. While it is not necessary to decide exactly what caused appellant's erratic driving, this theory provided a viable alternative to the one espoused by the state.
Based upon the foregoing analysis, we conclude that no rational trier of fact could have found all elements of the offense proven beyond a reasonable doubt. There was simply no evidence presented that appellant's actions, reactions, or mental processes were adversely affected and appreciably impaired by the ingestion of methadone, or any other drug of abuse. Thus, there was insufficient evidence to support appellant's conviction. Appellant's first assignment of error is sustained.
Appellant's second, third, and fourth assignments of error are moot and, therefore, need not be addressed pursuant to App.R. 12(A)(1)(c).
Accordingly, we reverse the judgment of the trial court, and discharge appellant because there was insufficient evidence to sustain his conviction for felony DUI.
 ____________________________ JUDGE WILLIAM M. O'NEILL
NADER, J., concurs, GRENDELL, J., dissents.