OPINION
{¶ 1} Appellant, Jillian M. Holder, appeals the judgment entry of the Geauga County Court of Common Pleas, finding her guilty of aggravated murder, attempted aggravated murder, and aggravated burglary.
 {¶ 2} On February 22, 2000, appellant, who at the time of the offense was seventeen years of age, was charged in the Geauga County Juvenile Court with three counts: count one, aggravated murder, in violation of R.C. 2903.01(B); count two, attempted aggravated murder, in violation of R.C. 2923.02(A); and count three, aggravated robbery, in violation of R.C. 2911.01(A). On that same date, appellee, the state of Ohio, filed a motion to transfer jurisdiction to the Geauga County Court of Common Pleas, General Division. A hearing took place on August 17, 2000, at which the juvenile court found probable cause that appellant had committed the offenses charged. The matter then proceeded to an amenability hearing on appellee's motion to transfer jurisdiction, which was granted on October 6, 2000.[1]
 {¶ 3} Appellant was then charged in the general division of the court of common pleas, on October 19, 2000, as follows: counts one and two, aggravated murder with a firearm specification, in violation of R.C. 2903.01(A) and (B); count three, aggravated robbery with a firearm specification, in violation of R.C. 2911.01(A)(3); and count four, attempted aggravated murder, in violation of R.C. 2923.02(A). On October 20, 2000, appellant entered a plea of not guilty to the charges. A jury trial commenced on March 5, 2001, and continued until March 12, 2001.
 {¶ 4} At the trial, the evidence revealed that on February 18, 2000, appellant spent her day off from school with her boyfriend, Wesley Pearson ("Pearson"), and Marcus Moorer ("Moorer"), who had just turned fifteen. On the evening of February 18, 2000, appellant, Pearson, and Moorer entered the Clark Oil Gas Station ("Clark Oil") located in Chesterland, Ohio. The clerk on duty at the station that evening was Danielle Kovacic ("Kovacic"), who was shot and killed. Also, at the station that night visiting her best friend, Kovacic, was Rachael Cogswell ("Cogswell"). Cogswell was shot, but the bullet grazed her head.
 {¶ 5} Moorer took the stand and related that he entered a plea of guilty to the charges of aggravated murder, aggravated attempted murder, and aggravated robbery. Moorer revealed that Pearson was once his foster brother and he looked up to him like a big brother. They lived in the same home for two years. After Pearson moved out, Moorer would see him on the weekends and Sundays after school.
 {¶ 6} Moorer stated that he found a revolver in his employer's desk drawer. He called Pearson to see if he wanted the gun. Pearson said he wanted the gun, so Moorer stole it. On February 11, 2000, which was Moorer's birthday, Moorer gave the revolver to Pearson. On that day, appellant, Pearson and Moorer went to the mall, and Moorer indicated that Pearson had $1,100 in cash. According to Moorer, Pearson stated that he got the money from robbing "some stores or some gas stations in Toledo." He added that appellant said that she and Pearson "were going to move out of the places they lived out of and that robbing gas stations was gon'na *** be the way they were going to make their living." Appellant denied making such a statement.
 {¶ 7} Before appellant, Pearson, and Moorer arrived at Clark Oil, they spent the day driving around in appellant's car. Appellant and Pearson met up with Chris Anderson ("Anderson") and went to visit Sue Rich ("Rich").[2] They were in Rich's driveway because she was not allowed to have anyone in the house while her parents were gone. Upon leaving Rich's home, they picked up Moorer and went to the mall. It is undisputed that appellant, Pearson, and Moorer used marijuana that day. After leaving the mall, appellant made a comment about money, and Anderson testified that Pearson stated "he needed to make a come up and was broke ***." Anderson explained that "a come up" means to "[t]ake money from somebody." In his testimony, Moorer also related that Pearson mentioned the "need to make a come up," which in his opinion, meant "to find a way to get some money."
 {¶ 8} Thereafter, appellant, Pearson, Moorer, and Anderson traveled to the home of Alex Fitts ("Fitts"). Pearson, Moorer and Anderson went inside Fitts' home. While they were talking, Pearson mentioned that he had a gun, but it was not with him. It was in the car. Moorer testified that he saw the gun he gave Pearson when he was picked up on February 18, 2000. Anderson also stated that he saw the gun that day.
 {¶ 9} While Pearson, Moorer, and Anderson were inside of Fitts' home, appellant testified that she left and went to Rich's house. Rich related that she entered the passenger side of the car and recalled that appellant "leaned over and picked up [a] suitcase *** and took out a small gun." Appellant later returned to Fitts' home, and she, Pearson, Moorer, and Anderson left. Anderson was dropped off and did not see appellant, Pearson, or Moorer for the remainder of the evening.
 {¶ 10} According to Moorer, after they dropped off Anderson, he, appellant, and Pearson proceeded to the park. After leaving the park, they went to two other gas stations with the intent of robbing them. However, they were unable to rob the gas stations because they were too busy. They decided to travel to Clark Oil.
 {¶ 11} Timothy R. Reinhard ("Reinhard") was filling his car with gas at Clark Oil on February 18, 2000, when he noticed a "small blue vehicle" driven by "a white female." He also witnessed two black males outside of Clark Oil and later observed one of the males next to the driver's side window. On that same date, Brad Scott ("Scott"), who had known appellant since the fifth grade, pulled into Clark Oil and saw appellant's car by the gas pumps, and she was near her car. As he entered Clark Oil, he observed Kovacic and Cogswell behind the counter and Pearson and Moorer in the gas station. Scott indicated that he had spoken with all of them. As he was leaving Clark Oil, he noticed that appellant's vehicle had moved and was parked behind the restrooms.
 {¶ 12} Moorer testified that he and Pearson entered Clark Oil, and that Pearson knew Kovacic and Cogswell. Moorer explained that Pearson had previously worked at Clark Oil and was speaking with Kovacic and Cogswell about the new security system. They were in the store for approximately fifteen to twenty minutes that first time. Moorer stated that he and Pearson were in and out of Clark Oil multiple times that night. Moorer revealed that Pearson told him "he wanted to rob the Clark [Oil] and that he needed [Moorer] to shoot and kill both of the girls in the gas station *** [b]ecause they knew his face and they knew who he was and he worked there before." He also recalled that Pearson told appellant "[w]hen you hear the first shot run out of the gas station, open up the doors, and let the seat forward so [Moorer] can jump in." According to Moorer, Pearson also instructed appellant to "walk around and act like she was buying things until it was time to close up the gas station."
 {¶ 13} While on the stand, Moorer proceeded to describe the shooting that took place at Clark Oil that night. He shot Kovacic and attempted to shoot Cogswell, while Pearson got money out of the cash register. When he first began shooting, appellant was inside Clark Oil "by the pop machine." Moorer explained that appellant knew Kovacic and Cogswell were going to be shot because Pearson told her that when she heard the first shot, she should "run out of the gas station, open the car door, let the seat forward so [Moorer could] jump in." Moorer testified that all three of them followed their part of the plan to rob Clark Oil. After they left Clark Oil, Moorer gave the gun to Pearson, who wiped it off and threw it out the window. Although appellant does not recall a gun being thrown from the window of her car, the gun was retrieved from the spot where Moorer indicated it was located.
 {¶ 14} After the shooting, while in the car, Moorer recalled that appellant told Pearson to count the money. Moorer stated appellant even turned the light on in the car so Pearson could count it. Appellant and Pearson dropped Moorer off at his home.
 {¶ 15} Cogswell took the stand at the trial and related that while she was visiting Kovacic, Pearson and Moorer were in Clark Oil. The conversation that took place was mainly between Kovacic and Pearson, and that the subject matter dealt with the security at Clark Oil. Pearson and Moorer left Clark Oil and returned about a half-hour later. She also recollected that appellant had been in the store that night. According to Cogswell's testimony, appellant, Pearson, and Moorer were in and out of the store a few times that night. However, at about 10:50, she recalled all three of them coming back to the store. Appellant "was kind of milling around in the store looking at things. Eventually she went over to the beer coolers." She recalled that appellant had pumped gas in her car, but had not paid for it. Further, there was still a customer in Clark Oil, but once that customer left Kovacic started to turn the lights off in the parking lot and in the front of the store. Cogswell explained that all of a sudden, Moorer shot Kovacic twice in the back. Subsequently, Pearson told Moorer, in reference to Cogswell, to "[g]et that bitch in the back and shoot her." Cogswell indicated that Kovacic said "[n]o, please stop." Moorer followed Cogswell into the back room, pulled the trigger twice and realized that he was out of bullets. Moorer ran out of the store, and Cogswell called 9-1-1.
 {¶ 16} Sergeant Phillip A. Cavasinni ("Cavasinni") of the Chester Township Police Department was dispatched to Clark Oil at 11:07 p.m. on February 18, 2000. As Cavasinni entered Clark Oil, he announced his presence, to which he "heard a female's voice from the back of the store." Kovacic was sitting on the floor and was seriously wounded. Cogswell was standing by a desk with the telephone. Cavasinni noticed that Kovacic had been shot and that Cogswell had suffered a graze wound on the left side of her head. Cavasinni asked Cogswell "how many there were," and she proceeded to tell him that there were "[t]hree, two black guys and a white girl *** [and she] went to school with two of them." She then identified two of the perpetrators as appellant and Pearson, but she was unable to recognize the other one. Once the ambulance arrived, Cavasinni escorted Cogswell to the ambulance and secured the crime scene. Kovacic later died as a result of four gunshot wounds.
 {¶ 17} Sergeant Harry Eidan ("Eidan") of the Chester Township Police Department was also dispatched to the scene at about 11:10 p.m., on February 18, 2000. He drove to the home of appellant's parents, but appellant was not there. Appellant's mother telephoned appellant on her cellular phone, and Eidan spoke with her. As a result of the conversation, Eidan learned of appellant's whereabouts and traveled to the location. Appellant answered the door at Pearson's apartment and stated that she "thought one [officer] was coming." Appellant, who was in her pajamas, and Pearson were handcuffed and transported to the Chester Township Police Department. Appellant was read her rights at the police station.
 {¶ 18} At the close of appellee's case-in-chief, appellant orally moved for a Crim.R. 29 motion for acquittal. She later filed a written motion with the trial court. The motion was denied. Appellant's guidance counselor and a couple of her high school teachers took the stand and related that appellant was a very good student that did not get into trouble. Further, appellant's Girl Scout troop leader testified that she knew appellant for six years and that appellant was not violent and did not misbehave.
 {¶ 19} Appellant testified in her behalf and explained her history with Pearson. She stated that the relationship was on and off throughout high school. However, appellant and Pearson began dating again in the beginning of her senior year. She also admitted that, at that time, she was smoking marijuana four to five times a day.
 {¶ 20} On the night of the incident, appellant did not recall any talk of robbing gas stations. She also denied knowing about a shooting or robbery. She testified that she was very high when Pearson and Moorer entered Clark Oil. She recounted that when she entered Clark Oil, "[Moorer] was standing near the end of the counter and [Pearson] was standing in front of the cash register." Moorer then "opened fire on [Kovacic]" and Pearson "ran around the counter and opened the cash register." She explained that she "turned around and ran out to [her] car. [She] needed to leave. [She] didn't understand what was going on." She added that she "was trying to turn the car on. [Pearson] had left it in auxiliary and he and [Moorer] got in the car before [she] could get the key turned." At the conclusion of her testimony, the defense rested and moved for an acquittal, which was denied.
 {¶ 21} On March 7, 2001, appellant filed motions and memoranda regarding appellee's failure to turn over exculpatory evidence to appellant and as to constitutional violations by appellee for the dismissal of female jurors with peremptory challenges during voir dire. In a March 8, 2001 entry, the trial court denied the motion concerning the use of peremptory challenges and explained that appellant "failed to object to the peremptory challenges as they were being exercised by [appellee] and further failed to object to the *** peremptory challenges until the day after a jury was seated."
 {¶ 22} Appellant then filed a motion for acquittal on March 12, 2001, which was denied. The trial court also denied the motion regarding appellee's failure to turn over exculpatory evidence on that same date. The trial court stated that appellant's "motion was overly broad" because it asked the court to order appellee "to provide information beyond that required by [Crim.R.] 16, the laws of the State of Ohio, or the Constitutions of the State of Ohio and of the United States." In addition, the trial court explained that the motion only mentioned the statement in regard to Pearson and was filed on March 7, 2001, after the trial had begun.
 {¶ 23} The jury returned a verdict of not guilty as to count one for aggravated murder, in violation of R.C. 2903.01(A) and a guilty verdict as to the other three counts. In an entry dated March 22, 2001, the sentence was as follows: (1) for count two, aggravated murder in violation of R.C. 2903.01(B), appellant received life in prison with the eligibility for parole after twenty five years; (2) for count three, aggravated robbery, appellant got a prison term of three years to be served concurrently with count two; (3) for count four, attempted aggravated murder, appellant was sentenced to a five year prison term to be served consecutively with counts two and three; and (4) for the firearm specifications as charged in counts two, three, and four, appellant received a prison term of three years to be served consecutively with counts two, three, and four.
 {¶ 24} On April 6, 2001, appellant filed a motion to show cause pursuant to R.C. 2705.01 stating that the prosecutors committed various violations of her constitutional rights. While the motion to show cause was pending in the trial court, appellant timely filed a notice of appeal from the March 22, 2001 entry. Thereafter, on April 18, 2001, the trial court issued a judgment entry denying appellant's motion to show cause. On July 10, 2001, appellant filed a renewed motion to show cause and a motion for a new trial. In a judgment entry dated July 11, 2001, the trial court noted that it was divested of jurisdiction to consider the motions since an appeal was pending in this court. Appellant now assigns the following as error:
 {¶ 25} "[1.] The juvenile court erred and abused its discretion by determining that appellant was not amenable to care or rehabilitation or further care or rehabilitation in any facility designed for the care, supervision and rehabilitation of delinquent children.
 {¶ 26} "[2.] The trial court's denial of appellant's motions alleging that appellee employed peremptory challenges to purposefully exclude members of the jury solely on the basis of their gender, and failure to grant appellant a new trial was clearly erroneous, resulting in plain error and prejudice to appellant.
 {¶ 27} "[3.] The trial court erred by denying appellant's motion and memorandum re: Giglio-Brady violations with/for potential witness promise issues and appellant's motion to show cause without a hearing, to the prejudice of appellant.
 {¶ 28} "[4.] [Appellant] received ineffective assistance of counsel in violation of her rights pursuant to the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.
 {¶ 29} "[5.] [Appellant's] conviction is against the manifest weight of the evidence."
 {¶ 30} Under the first assignment of error, appellant argues that the trial court abused its discretion by determining that appellant was not amenable to care or rehabilitation in any facility designed for the care, supervision and rehabilitation of delinquent children.
 {¶ 31} Former R.C. 2151.26 and Juv.R. 30 provide the procedures to be followed in relinquishing the juvenile court's exclusive jurisdiction over a minor to the general division for prosecution as an adult offender. State v. Whisenant (1998), 127 Ohio App.3d 75, 90. A juvenile court may bind over a juvenile for prosecution as an adult if it finds that the following criteria exist: (1) the child was fifteen years or older at the time of the commission of an act that would constitute a felony if committed by an adult, (2) there was probable cause to believe the child performed the act allegedly committed, (3) there are reasonable grounds to believe that the child was not amenable to care or rehabilitation in the juvenile system, and (4) there are reasonable grounds to believe that the safety of the community may require the juvenile be confined beyond his or her twenty-first birthday. Id. The decision to relinquish jurisdiction is within the sound discretion of the trial court. Id.
 {¶ 32} Furthermore, factors that the juvenile court must consider in determining whether the juvenile is amenable to rehabilitation in the juvenile system are as follows: "(1) the child's age and mental and physical condition, (2) the child's prior juvenile record, (3) previous efforts to rehabilitate the child, (4) the child's family environment, (5) the child's school record, and (6) the specific facts of the offense for which probable cause was found." Id. There is no requirement that these five factors have to be resolved against the juvenile before a bindover is permitted. State v. Douglas (1985), 20 Ohio St.3d 34, 37, citing State v. Oviedo (1982), 5 Ohio App.3d 168.
 {¶ 33} However, a category one offense carries with it mandatory bindover if there is probable cause that the juvenile committed it, personally or through complicity, and the juvenile was at least sixteen. Former R.C. 2151.26(B)(3)(a); Agee v. Russell (2001), 92 Ohio St.3d 540,546-548. In Agee, 92 Ohio St.3d at 546, the Supreme Court of Ohio clarified its holding in State v. Hanning (2000), 89 Ohio St.3d 86, and stated that Hanning was only applicable to cases in which the mandatory bindover was based on a firearm specification.
 {¶ 34} We note that "an appellate court must decide a case based on the law as it exists at the time of its decision, and, therefore, an amended provision controls unless a vested right has accrued under the prior law." Kure v. North Royalton (1986) 34 Ohio App. 227, 228. Therefore, a change in the case law while the case is on appeal applies. Accordingly, the holding in Agee has application here.
 {¶ 35} On August 17, 2000, the juvenile court determined that probable cause existed, and then the trial court conducted an amenability hearing on October 4, 2000. In its October 6, 2000 judgment entry, the juvenile court explained that it considered the evidence from the probable cause hearing and the amenability hearing along with the report on the mental health assessment prepared by the court-appointed psychologist. After weighing the Whisenant factors, the juvenile court decided to transfer jurisdiction to the general division. In addition to the severity of the crime, the trial court also took into account the safety of the community, the grievousness of the manner in which the crime was committed, and the shortness of the time involved.
 {¶ 36} Here, one of the acts charged was aggravated murder, a category one offense. Further, appellant was seventeen at the time the murder took place. There was evidence that appellant had possession of the gun when she went to the home of Rich on her own and showed the gun to Rich. The evidence at trial also revealed that appellant participated in the robbery that took place at Clark Oil, during which Kovacic was shot and killed with the gun, and that appellant was driving the car when the gun was discarded after the murder.
 {¶ 37} Here, since appellant was seventeen and the offense was a category one, the bindover was mandatory. Thus, the gun specification analysis of Hanning does not apply because once there was a finding of probable cause with respect to a category one offense, appellant's bindover was mandatory, pursuant to Agee. Hence, the amenability hearing conducted by the trial court in this matter was unnecessary.
 {¶ 38} We conclude that the record before us contains sufficient, credible evidence to support the court's judgment that there were reasonable grounds to believe appellant was not amenable to rehabilitation in the juvenile court. Thus, there was no abuse of discretion in the court's decision to bind appellant over to the general division. Appellant's first assignment of error is not well-taken.
 {¶ 39} For her second assignment of error, appellant posits that the trial court erred in denying her motion alleging that appellee employed peremptory challenges to exclude members of the jury based of their gender and in failing to grant a new trial, which resulted in plain error and prejudice.
 {¶ 40} In Batson v. Kentucky (1986), 476 U.S. 79, 89, the United States Supreme Court held that a prosecutor's racially motivated exercise of peremptory challenges violated the Equal Protection Clause of theFourteenth Amendment. Batson has also been extended to prohibit peremptory strikes based on gender in J.E.B. v. Alabama ex rel. T.B.
(1994), 511 U.S. 127, syllabus. As the Fourteenth Amendment protects the rights of prospective jurors to be free from discriminatory challenges, the exercise of even one peremptory challenge in a purposefully discriminatory manner violates equal protection. See State v. Gowdy
(2000), 88 Ohio St.3d 387, 393. A trial court's findings of no discriminatory intent will not be reversed on appeal absent a determination that it was clearly erroneous. State v. Hernandez (1992),63 Ohio St.3d 577, 583.
 {¶ 41} There is a three-part process for proving a Batson
violation: (1) a party must establish a prima facie case of discriminatory purpose, which can be done by pointing to a pattern of challenges against a particular race or gender; (2) the burden of production then shifts to the proponent of the strike to come forward with a race or gender neutral explanation; and (3) if a race or gender neutral explanation is tendered, the trial court must decide whether the opponent of the strike has proved purposeful discrimination. See, generally,Gowdy, supra, at 392-393.
 {¶ 42} In the case sub judice, appellant did not raise a Batson
violation until after the jury had been sworn in and opening statements were made. Hence, appellant has waived all but plain error. State v.Lundgren (1995), 73 Ohio St.3d 474, 485, citing State v. Seiber (1990),56 Ohio St.3d 4, 13. Moreover, after reviewing the record, it is our view that gender-neutral reasons explain the prosecutor's challenges to three prospective female jurors.
 {¶ 43} Appellee exercised one of its challenges after learning in voir dire that the prospective juror knew appellant's sister and also recognized several of the witnesses that would be testifying. Appellee used another challenge on a juror who mentioned that the case would be difficult for her. She also stated she had concerns regarding her employment because she worked for a tax accountant, and it was a busy time of the year due to the nature of her work. Appellee exercised the third challenge on a juror who had had negative experiences with law enforcement and had mentioned while she was questioned that her husband brought the incident to her attention. She also revealed that she asked her husband what all of the commotion was about on the night the incident occurred. The juror basically relied on her husband's opinions and information. Appellee used its fourth peremptory challenge on a male.
 {¶ 44} Even after the three women were excused, the jury still consisted of eight females and four males along with two alternates, one of whom was a man and the other a woman. Furthermore, after reviewing the transcript, it is our position that appellee's explanations for their challenges were gender neutral on their faces and were otherwise supported by the transcript. Therefore, appellant did not suffer any prejudice and plain error also does not exist. Appellant's second assignment of error is overruled.
 {¶ 45} In her third assignment of error, appellant contends that the trial court erred to the prejudice of appellant by denying her motion and memorandum regarding Brady violations with potential witness promise issues. Pearson was on appellee's witness list for trial, but several days before trial, appellee informed the trial court that it would not be calling Pearson as a witness. Thereafter, on March 7, 2001, appellant filed a motion and memorandum regarding the Brady violations. In that motion, appellant moved the trial court to order appellee to inform her counsel of the reason that could be exculpatory for appellee's decision not to call Pearson as a witness.
 {¶ 46} In Brady v. Maryland (1963), 373 U.S. 83, 87, the United States Supreme Court held that the "[s]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." See State v. West
(Oct. 27, 2000), 11th Dist. No. 98-P-0132, 2000 WL 1616802, at 3. To establish a violation, a defendant must prove that the prosecution failed to disclose evidence upon request, the evidence was favorable to the defense, and the evidence was material. Moore v. Illinois (1972),408 U.S. 786, 794-795; West, supra, at 3.
 {¶ 47} In United States v. Bagley (1985), 473 U.S. 667, 682, the court stated that evidence is "material" in this sense if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceedings would have been different. With respect to the materiality prong:
 {¶ 48} "Bagley's touchstone of materiality is a `reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A `reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression `undermines confidence in the outcome of the trial.'" Kyles v. Whitley
(1995), 514 U.S. 419, 434. See, also, West, supra, at 3.
 {¶ 49} "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense." United States v. Agurs (1976), 427 U.S. 97,109-110. In the case at hand, appellant argues in her brief that she only learned of Pearson's statement as to her lack of knowledge regarding the robbery after her trial and sentencing was concluded. Yet, the record on appeal contains an exhibit, which is a letter appellant received from Pearson while she was incarcerated and prior to her trial, in which Pearson stated that neither of them had anything to do with what transpired on February 18, 2000. Hence, we conclude this argument lacks merit.
 {¶ 50} On the other hand, appellee asserts that there was no evidence withheld and appellant was given all discoverable evidence that it was aware of and that appellant was entitled to receive, including complete access to all witness statements as well as the names and addresses of all potential witnesses for appellee. After reviewing the record, it is our position that appellant had access to all of the statements made by witnesses, and no evidence was withheld. Hence, there was no Brady violation.
 {¶ 51} Furthermore, appellant claims that Pearson's statements would have proved that she and Pearson were innocent as they knew nothing of the robbery and shooting. Yet, appellant's counsel had to determine the credibility of the statements since Pearson pleaded guilty after making the statements. Thus, it appears that her counsel decided not to pursue the statements made by Pearson. Further, appellant in her own testimony stated that Pearson was involved in the robbery and shooting. She also referred to him as a liar. Therefore, it is this court's determination that the evidence, which appellant now complains about, was immaterial to her defense as there was already sufficient evidence to show she was involved. Appellant's third assignment of error is not well-founded.
 {¶ 52} Under her fourth assignment of error, appellant asserts that she received ineffective assistance of counsel. First, she claims that her trial attorney failed to submit an expert psychological report to the juvenile court during the hearing on the issue of whether to transfer jurisdiction to the court of common pleas. Second, she maintains that her counsel failed to make a timely challenge to the unconstitutional removal of venire persons based upon gender. Finally, she declares that her trial counsel failed to submit sufficient documentary evidence of discovery violations by appellee until after the trial court was divested of jurisdiction by the filing of the notice of appeal.
 {¶ 53} To warrant a reversal on the grounds that an appellant was not provided with effective assistance of counsel, the appellant bears the burden of meeting the two-prong test set forth in Strickland v.Washington (1984), 466 U.S. 668, 687, which states that: "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction *** has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by theSixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction *** resulted from a breakdown in the adversary process that renders the result unreliable."
 {¶ 54} In order to determine whether an attorney's performance was deficient, the trial court must inquire whether the attorney provided "reasonably effective assistance, considering all the circumstances."State v. Loza (1994), 71 Ohio St.3d 61, 83, citing Strickland. "ASixth Amendment violation does not occur `unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance.' ***" State v. Goodwin (1999), 84 Ohio St.3d 331,334, quoting State v. Bradley (1989), 42 Ohio St.3d 136, 142. In addition, a properly licensed attorney is presumed to be competent, and thus, judicial scrutiny of his or her performance must be highly deferential. Strickland, 466 U.S. at 689. An attorney's strategic decisions and trial tactics will not support a claim of ineffective assistance. State v. Clayton (1980), 62 Ohio St.2d 45, 48-49.
 {¶ 55} Under the second prong of the Strickland test, an appellant must show that he or she was prejudiced. To establish prejudice, an appellant must prove that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Bradley, 42 Ohio St.3d at paragraph three of the syllabus; see, also, State v. Stojetz (1999), 84 Ohio St.3d 452, 457. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." State v. Bays (1999), 87 Ohio St.3d 15, 27. See, also, Statev. Brant (Aug. 4, 2000), 11th Dist. No. 99-P-0037, 2000 WL 1114845, at 9.
 {¶ 56} In the case at bar, appellant claims her trial attorneys failed to submit the expert psychological report of Dr. James R. Eisenberg ("Dr. Eisenberg") to the juvenile court during the hearing on whether to transfer jurisdiction to the general division of the court of common pleas. The hearing took place on October 4, 2000. At the beginning of the hearing, the trial court stated that there were stipulations and told the prosecution to read them into the record. The prosecutor mentioned that "[t]he first of these items, the September 29th, 2000 Opinion and the [curriculum vitae] of Dr. James R. Eisenberg ***." The prosecution further added that "[t]hese stipulations [were] solely for the admission of the above-listed items at the amenability phase of the [Juv.R.] 30 bindover proceeding for [appellant]." Appellant's attorney entered into the stipulations also. The trial court agreed that the documents would be admitted and that he reserved the right to call any of those persons as witnesses in the proceedings.
 {¶ 57} The evidence reveals that the juvenile court was provided with the report of Dr. Eisenberg. Appellant has also not supported this claim with any evidence dehors the record that indicates that Dr. Eisenberg's testimony or report would have assisted the defense any further. Moreover, appellant's attorneys cross-examined the court appointed psychologist. Hence, after reviewing the record, we are unpersuaded that defense counsel's performance was deficient since Dr. Eisenberg's report was admitted at the hearing. The juvenile court judge made the decision not to call Dr. Eisenberg to the stand. In addition, as we stated in the first assignment of error, the amenability hearing was unnecessary as appellant's bindover was mandatory. Therefore, it is our view that appellant received effective assistance of counsel as to this issue.
 {¶ 58} Appellant also maintains she received ineffective assistance of counsel because of her counsel's failure to make a timely challenge to the unconstitutional removal of venire persons based upon gender. However, even though we agree that the alleged Batson violations were not raised at the appropriate time, appellant has not demonstrated that the outcome of the trial would have been different or that she was prejudiced in any way. As previously mentioned, the majority of the jurors were women.
 {¶ 59} Lastly, appellant posits that her trial counsel failed to submit sufficient documentary evidence of appellee's discovery violations until after the trial court was divested of jurisdiction by filing the notice of appeal. However, debatable strategic and tactical decisions will not form the basis of a claim for ineffective assistance of counsel, even if there had been a better strategy available. State v.Phillips (1995), 74 Ohio St.3d 72, 85. In other words, errors of judgment regarding tactical matters do not substantiate an appellant's claim of ineffective assistance of counsel. Even if appellant's trial counsel's performance was deficient, appellant has failed to show that she suffered from prejudice. Hence, appellant's fourth assignment of error is meritless.
 {¶ 60} In the fifth assignment of error, appellant alleges that her conviction was against the manifest weight of the evidence.
 {¶ 61} In deciding whether a verdict is against the manifest weight of the evidence, an appellate court reviews the entire record, weighs all the evidence and reasonable inferences stemming therefrom, and considers the credibility of the witnesses. State v. Beaver (1997),119 Ohio App.3d 385, 398; State v. Thompkins (1997), 78 Ohio St.3d 380,387; State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 WL 738452, at 5. The trier of the facts has the primary responsibility for determining the "*** weight to be given the evidence and the credibility of the witnesses ***." State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. After we conduct our review of the record, if we conclude that the jury lost its way, we will reverse the conviction. Beaver, 119 Ohio App.3d at 398.
 {¶ 62} In the case at bar, there were several witnesses presented by appellee. Appellant also presented witnesses in her behalf. Moorer and Cogswell along with other witnesses placed appellant at Clark Oil at the time Kovacic was murdered. Appellant admitted she drove the car after Moorer shot Kovacic and Cogswell. She testified that she was in Clark Oil when Moorer "opened fire on [Kovacic]" and Pearson "ran around the counter and opened the cash register." She also knew there was a gun in her car because she showed it to Rich earlier that evening. She claims that she did not know that the gun was thrown out of her car window after the murder. She alleges that she acted out of fear for her life. However, the jury had the opportunity to hear, observe, and weigh all of the testimony of the witnesses during the trial and found appellee's witnesses to be more credible.
 {¶ 63} Based on the record before us, we cannot say that the jury lost its way and created such a miscarriage of justice so that the conviction must be reversed. Thus, this court will not substitute its judgment for that of the jury. We conclude that based on the witnesses presented, there was no manifest miscarriage of justice. Appellant's fifth assignment of error is without merit.
 {¶ 64} For the foregoing reasons, appellant's assignments of error are not well-taken. The judgment of the Geauga County Court of Common Pleas is affirmed.
WILLIAM M. O'NEILL, P.J., and JUDITH A. CHRISTLEY, J. concur.
[1] This entry was appealed to this court on April 18, 2001.
[2] Rich, who was appellant's friend, testified that appellant "would like talk a little differently when she was with [Pearson]." Rich further added that the changes in appellant were upsetting because she was not the same friend that she used to be. Rich related that she personally did not like Pearson because she knew the way that he had treated his other girlfriends. When Rich told appellant how she felt about Pearson, it affected their friendship.