[Cite as *State v. Kirk*, 2013-Ohio-1941.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLANT,          CASE NO.  3-12-09

     v.

SEAN M. KIRK,                    O P I N I O N

     DEFENDANT-APPELLEE.

Appeal from Crawford County Common Pleas Court
Trial Court No. 11-CR-0237

**Judgment Reversed and Cause Remanded**

Date of Decision:   May 13, 2013

APPEARANCES:

    *Stanley E. Flegm and Clifford J. Murphy* **for Appellant**

    *Brent L. English*  **for Appellee**

**ROGERS, J.**

{¶1} Plaintiff-Appellant, the State of Ohio, appeals the judgment of the Court of Common Pleas of Crawford County suppressing the statements made by Defendant-Appellee, Sean Kirk, during the course of a police interview. On appeal, the State argues that the trial court erred by finding that Kirk (1) was subject to custodial interrogation during the police interview; and (2) did not voluntarily, knowingly, and intelligently waive his *Miranda* rights. For the reasons that follow, we reverse the trial court's judgment.

{¶2} On December 12, 2011, the Crawford County Grand Jury indicted Kirk on one count of rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree, and on one count of importuning in violation of R.C. 2907.07(A), a felony of the third degree. The indictment arose from Kirk's alleged sexual encounters with a 12-year old female, E.E.

{¶3} On January 25, 2012, Kirk moved to suppress his statements from a police interview that occurred on January 7, 2010. At the time of the interview, Kirk was an 18-year old high school student at Pioneer Joint Vocational School ("Pioneer"). The interview occurred in a small office located on Pioneer's campus and it was conducted by Officer Dan Clark of the Galion Police Department. The trial court held a suppression hearing on May 1 and May 3, 2012 at which the following relevant evidence was adduced.

{¶4} Officer Clark testified regarding his investigatory activities on January 7, 2010. Before interviewing Kirk, Officer Clark learned that Kirk had previously been questioned by the police in an unrelated matter and that he had signed a *Miranda* waiver as part of the questioning. Officer Clark also testified that he had no difficulty talking to Kirk during the course of the interview. Further, Officer Clark identified the video recording of the interview and the *Miranda* form that Kirk signed.

{¶5} The video recording of the interview reveals that Officer Clark read each of the four *Miranda* rights separately and that after each right, he stopped and asked whether Kirk understood. This reading of the *Miranda* warning occurred as follows:

> Q:　Okay. Well, what I'm going to do right now, I'm going to go ahead and read your *Miranda* rights to you, what I'm going to read to you is your statement of rights, okay. And each one of these I read to you I need a verbal response, yes, you understand or, no, you don't understand.
>
> A:　All right.
>
> Q:　Okay. You have to [sic] right to remain silent, you understand that?
>
> A:　Yes.
>
> Q:　Okay. Anything you say can be used against you in court, you understand that?
>
> A:　Yes.

Q: You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning, do you understand that?

A: Yes.

Q: You also have the right that if you cannot afford a lawyer there will be no questions until one is appointed for you. You understand your rights I've read to you?

A: Yes. Interview Tr., p. 2-3.

Officer Clark then continued by reading the waiver of rights:

Q: Okay. Underneath that is your waiver of rights. It says, I have read this statement of my rights and understand what my rights are. I'm willing to make a statement and answer any questions. I do not want a lawyer at this time. I understand what I'm doing, no promise or threats have been made to me and no pressure or force of any kind has used [sic] against me. If you decide now to answer questions without a lawyer present you also have the right to stop at any time. You also have the right to stop answering questions until you talk to a lawyer.
So do you want to talk to me today about this deal with this – this girl?

A: I – I have no clue what girl –

Q: Okay.

A: - you're talking about.

Q: Okay.

A: I have like no clue.

Q: Well, like I say, do you want to waive your rights and talk to me today?

A:   Wait.  Oh, I think I know who you're talking about.

Q:   Okay.

A:   Okay.

Q:   All right.

A:   Yeah.

Q:   So you understand what I'm here for then?

A:   Yeah.[1]  Interview Tr., p. 3-5.

**{¶6}** Officer Clark then asked Kirk about his age, education level, and ability to read and write.  After Kirk responded, Officer Clark said, "If you want to read [the waiver form] over again and you're willing to talk to me, go ahead and sign that down there as to your waiver of rights."  Interview Tr., p. 6.  Kirk then signed the waiver form, but he did not read it.  After briefly describing E.E.'s allegations, Officer Clark again asked whether Kirk understood his rights, to which Kirk responded affirmatively.

**{¶7}** Once the waiver form was signed, Officer Clark started to interrogate Kirk regarding his alleged sexual activity with E.E.  The video shows that at various times during the interview, Kirk blinked his eyelids intensely, fidgeted, and looked away from Officer Clark.  Despite these actions, he generally

---

[1] Kirk's confusion at this point in the interview stemmed from Officer Clark's mispronunciation of E.E.'s name.

presented a calm demeanor and he responded to Officer Clark in a straightforward manner. At two points, Kirk indicated that he did not understand Officer Clark's questions. The first related to Kirk's lack of familiarity with the term "ejaculate":

Q: Did you ejaculate?

A: No.

Q: You didn't? You sure about that?

A: Wait. What? What does that mean?

Q: Did you cum?

A: Oh.

Q: Ejaculate in her mouth and stuff.

A: No. Interview Tr., p. 11-12.

The second related to Kirk's lack of familiarity with the term "intercourse":

Q: You guys had intercourse?

A: What – what does that mean?

Q: You had sex together?

A: No, no. Interview Tr., p. 12.

In total, the interview lasted approximately 25 minutes.

{¶8} On cross-examination, Officer Clark stated that he had no knowledge that Kirk had cognitive limitations before conducting the interview[2] and that he did not believe that Kirk had a difficult time understanding him. Officer Clark did acknowledge that he read the *Miranda* warning quickly and that he knew Kirk did not read the waiver form. He also admitted that he did not provide any additional warnings to Kirk besides those listed above.

{¶9} The suppression hearing featured dueling expert testimony from Dr. Dale Rupple, the State's witness, and Dr. John McGregor, Kirk's witness, regarding Kirk's ability to understand and waive his *Miranda* rights. Dr. Rupple, a non-board certified clinical psychologist, testified that Kirk voluntarily, knowingly, and intelligently waived his *Miranda* rights. Conversely, Dr. McGregor, a board-certified forensic psychologist, testified that Kirk was unable to voluntarily, knowingly, and intelligent waive his rights.

{¶10} The basis for Dr. Rupple's opinion was his review of Kirk's school records, an interview with Kirk and his mother, and the report of Dr. McGregor. Dr. Rupple testified that Kirk had a fifth grade reading level and that his intelligence quotient ("IQ") range between 71 and 73 was "within the average

---

[2] Both of Kirk's parents indicated that they had told Officer Eric Bohach and other officers of the Galion Police Department about Kirk's cognitive limitations. However, Officer Bohach testified that he had no knowledge of the cognitive limitations and that he did not note their existence in the police report he prepared. Further, each of the Galion police officers who testified indicated that they were unaware of Kirk's cognitive limitations before the interview. Moreover, while several Galion High School and Pioneer administration officials testified that they knew Kirk was enrolled in special education courses at Pioneer, they also stated that they did not inform Officer Clark of this fact.

spectrum on the low end," which made him "borderline intellectual functioning on the full scale." Hearing Tr., p. 62. The interactional abilities of a person with such an IQ were described in the following colloquy:

> Q: Okay. And how would a person with [Kirk's] functioning IQ and abilities be able to interact?
>
> A: In what regard, sir?
>
> Q: Well, in regards to a normal conversation with an individual that they didn't meet before.
>
> A: On that factor alone, they should be able to interact relatively normally. Hearing Tr., p. 62-63.

Further, Dr. Rupple opined that none of the words that Officer Clark used in the *Miranda* warning would have confused Kirk. He also indicated that he found that Kirk was "malingering" during the course of his examination, meaning that Kirk was purposefully answering questions in such a way as to suggest lower intelligence. Hearing Tr., p. 98.

{¶11} Moreover, Dr. Rupple testified to the deficiencies he saw in Dr. McGregor's report. He noted that Dr. McGregor's examination of Kirk lasted five hours, which Dr. Rupple said could cause test fatigue and adversely affect the results' accuracy. Dr. Rupple additionally stated that Dr. McGregor's examination suffered from a "contamination effect" in that Kirk's post-interrogation

experiences could have caused him to respond to questions in unexpected ways. Hearing Tr., p. 95.

{¶12} On cross-examination, Dr. Rupple acknowledged that before examining Kirk, he had only performed this type of assessment one other time. He also acknowledged that he did not ask whether Kirk understood what the right to remain silent or the right to a lawyer meant. Further, Dr. Rupple said that he was "on the edge" regarding Kirk's ability to understand and waive his rights. Hearing Tr., p. 112.

{¶13} Dr. McGregor, meanwhile, testified that his opinion regarding Kirk's ability to waive his rights was based on the results from an in-office examination, Kirk's educational records, and his mental health records. During the examination, Dr. McGregor administered a variety of personality and intelligence tests, including the "Grisso tests," which purport to gauge a person's ability to understand the vocabulary used in *Miranda* warnings. While administering these tests, Dr. McGregor did not find that Kirk was malingering.

{¶14} Dr. McGregor testified that Kirk's IQ placed him in the third percentile of the population, which "reflects significant cognitive defects." Hearing Tr., p. 386. Dr. McGregor also indicated that Kirk had a verbal comprehension score that placed him in the second percentile of the population and that signaled "significant impairment of verbal reasoning." Hearing Tr., p.

388. He also found that Kirk's reading level was in the "upper level of the 5th grade." Hearing Tr., p. 394. Based on these results and those gleaned from the Grisso tests, Dr. McGregor concluded that Kirk did not voluntarily, knowingly, and intelligently waive his rights before Officer Clark questioned him.

{¶15} On cross-examination, Dr. McGregor discussed Kirk's responses regarding his thought process during the police interview as follows:

Q:  I'm asking you, based on [your report], his reasoning, [Kirk's] reasoning, he's telling you, he said, I thought I was screwed; I didn't want to lie then I would have been more screwed, correct?

A:  Right.

Q:  That implies a thought process by [Kirk], would it not?

A:  Right.  Right.

Q:  And interacting and deciding as to whether or not he wanted to answer any questions being asked by the officer; would that be fair?

A:  He did – he did answer the questions, yes.  I would say that – that was – that was part of his reasoning that he – that he gave – that he gave, yes.  Hearing Tr., p. 424-25.

Dr. McGregor maintained that while Kirk engaged in the above reasoning during the police interview, the reasoning was flawed since it was "rooted in the misconceptions that he had about what his rights in that situation were." Hearing Tr., p. 425.

**{¶16}** Dr. McGregor also admitted that the terms he used when administering the Grisso tests were not consistent with the terms used by Officer Clark when reading the *Miranda* warning to Kirk:

> Q: Okay. I guess more importantly you say that it's noteworthy that the wording of the Miranda warnings used in the [Grisso tests] as published is not exactly the same as the version used by the police in this case which used simplified language, correct?
>
> A: Correct. Hearing Tr., p. 426.

Due to this inconsistency, Dr. McGregor asked Kirk both whether he understood the vocabulary used in the Grisso test and whether he understood the vocabulary used by Officer Clark. Dr. McGregor described Kirk's responses to these two questions as follows:

> Q: What'd [Kirk] get correct?
>
> A: Okay, that's what I'm telling you, okay. When I read the – the item from the – the sentence from the [Grisso] test, [Kirk] didn't know. So I read the sentence from the warning he was given [by Officer Clark] and he did know. Hearing Tr., p. 430.

Dr. McGregor continued to describe Kirk's performance on the Grisso test as follows:

> A: And * * * he knew, if you cannot afford an attorney, one will be appointed for you. He did know – he did give – got full credit on that item.
>
> * * *

Q:  Okay.  So be fair to say that he was understanding the word "attorney" and the word "lawyer," correct?

A:  Yes.

* * *

Q:  And, again, * * * he knew that interrogation meant – means questioning and that consult means talk?

A:  Yes, that's – that's correct.

Q:  * * * [Y]ou have that * * * [Sean] seemed to appreciate the role of his attorney as an advocate and the source of information, but he also appeared to understand the importance of being honest and truthful with his attorney.  You see that, sir?

* * *

[A]:  Okay, yes.  Hearing Tr., p. 430, 432-33.

Dr. McGregor also testified that Kirk understood the adversarial nature of the police interview and that his statements could be used against him.

{¶17} Kirk's parents, Michelle Kirk ("Michelle") and Gregory Kirk ("Gregory"), both testified at the hearing.  Michelle described Kirk's previous involvement with law enforcement.  Kirk was questioned about an incident in which he allegedly cracked a toilet seat at a local laundromat after throwing a glass bottle at it.  Michelle said that she was with Kirk during the questioning, which was brief and occurred in the waiting room at the Galion Police Department's office.  She also indicated that the family did not retain an attorney

for Kirk at that time. Meanwhile, Gregory testified that Kirk had to go before a magistrate of the juvenile court due to the incident.

{¶18} As to the police interview, Michelle testified that Kirk misstated his birthdate to Officer Clark and incorrectly identified his adopted siblings as foster children. Michele also said that after the interview, Kirk sent her a text message asking what an attorney was. Michelle also opined that Kirk looked "uncomfortable and frightened" as Officer Clark questioned him. Hearing Tr., p. 140. Gregory similarly agreed and said that Kirk appeared "nervous or afraid." Hearing Tr., p. 180.

{¶19} After considering this evidence, the trial court granted Kirk's motion to suppress on July 20, 2012. It found that the January 7, 2010 police interview of Kirk was a custodial interrogation requiring proper *Miranda* warnings. In assessing the propriety of the warnings in this matter, the trial court concluded that Officer Clark did not "make any attempt to determine whether or not [Kirk] understood the rights he was waiving by signing the [waiver] form." (Docket No. 29, p. 3). It also found Dr. McGregor's expert testimony to be "more compelling" than Dr. Rupple's expert testimony. (*Id*. at 4). As a result, the trial court decided that Kirk's waiver of his rights was not voluntary, knowing, and intelligent.

{¶20} The State timely appealed this judgment, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED IN DETERMINING THAT THE APPELLEE WAS IN CUSTODY FOR THE PURPOSES OF MIRANDA.**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED IN DETERMINING THAT THE APPELLEE DID NOT WAIVE HIS MIRANDA RIGHTS IN A KNOWING, INTELLIGENT, AND VOLUNTARY MANNER.**

**{¶21}** Since we find that the second assignment of error is dispositive to this appeal, we elect to address the assignments of error out of order.

*Assignment of Error No. II*

**{¶22}** In its second assignment of error, the State argues that the trial court erred in granting Kirk's motion to suppress. Specifically, it contends that the police interrogation of Kirk did not violate *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), since Kirk voluntarily, knowingly, and intelligently waived his rights. We agree.

*Standard of Review for Motions to Suppress*

**{¶23}** "Appellate review of a decision on a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson*, 137 Ohio App.3d 847, 850 (12th Dist. 2000).

Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of facts so long as they are supported by competent, credible evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100. The appellate court must then review the application of the law to the facts de novo. *Burnsid*e at ¶ 8.

### Miranda *Standard*

**{¶24}** A suspect in police custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires." *Miranda* at 479. Absent such a warning, a suspect's statements during a custodial interrogation are subject to suppression. *In re J.C.*, 173 Ohio App.3d 405, 2007-Ohio-5763, ¶ 14 (2d Dist.). However, if the suspect voluntarily, knowingly, and intelligently waived his *Miranda* rights before the interrogation, then suppression is inappropriate. *State v. Wheatley*, 3d Dist. No. 1-10-75, 2011-Ohio-1997, ¶ 11, citing *Miranda* at 444.

**{¶25}** The United States Supreme Court has stated that consideration of *Miranda* waivers must focus on two separate factors: (1) the voluntary nature of the defendant's confession; and (2) the defendant's ability to comprehend and waive his rights. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135 (1986); *see*

*also State v. Dailey*, 53 Ohio St.3d 88, 91 (1990) (adopting *Moran*'s two-prong test). In considering these factors, we assess the totality of the circumstances surrounding the interrogation. *State v. Gumm*, 73 Ohio St.3d 413, 429 (1995). Relevant circumstances in our inquiry include "age, experience, education, background, and intelligence" of the suspect, as well as "whether he has the capacity to understand warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560 (1979); *see also State v. Whisenant*, 127 Ohio App.3d 75, 87 (11th Dist. 1998) (stating that suspect's previous criminal experience is also a relevant circumstance). The burden to prove the existence of a valid waiver rests on the State and requires proof by a preponderance of the evidence. *State v. Broom*, 40 Ohio St.3d 277, 285 (1988).

{¶26} *Miranda* is an embodiment of the long-standing principle that police officers in the United States are precluded from improperly coercing criminal suspects into giving up confessions. *See Spano v. New York*, 360 U.S. 315, 320-21, 79 S.Ct. 1202 (1959) ("The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminal

themselves."); *Bram v. United States*, 168 U.S. 532, 542-43, 18 S.Ct. 183 (1897) ("[For a] confession * * * to be admissible, * * * [it] must not be extracted by any sorts of threats or violence, nor obtained by any direct or implied promises, however slight, nor by exertion of any improper influence."). Accordingly, the rationale for *Miranda*'s protections is that they are necessary to "reduce the likelihood that suspects would fall victim to constitutionally impermissible practices of police interrogation." *New York v. Quarles*, 467 U.S. 649, 656, 104 S.Ct. 2626 (1984); *see also Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515 (1986) ("The sole concern of the Fifth Amendment * * * is governmental coercion."); *Miranda*, 384 U.S. at 456 (stating that "we concern ourselves primarily with [incommunicado police-dominated atmospheres] and the evils it can bring"); *Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) ("The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers."). Based on this underlying principle, when courts have assessed the validity of a suspect's *Miranda* waiver, they have generally focused on the interrogation's circumstances "from the perspective of the police." *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009) (en banc); *see also United States v. Robinson*, 404 F.3d 850, 861 (4th Cir. 2005) ("In cases involving defendants with low intellectual ability, the knowingness of the waiver often turns on whether the defendant *expressed* an inability to

understand the rights *as they were recited*."); *Rice* at 751 ("[T]he question is not whether if [the defendant] were more intelligent, informed, balanced, and so forth he would not have his waived his *Miranda* rights, but *whether the police believed he understood their explanation of those rights * * *.*"); *State v. Roberts*, 32 Ohio St.3d 225, 232 (1987) (describing totality of the circumstances for assessing validity of *Miranda* warning as including "'the *apparent* intellectual and emotional state of the suspect'"), quoting *State v. McZorn*, 288 N.C. 417, 434, 219 S.E.2d 201 (1975); *State v. Jenkins*, 15 Ohio St.3d 164, 233 (1984) (finding valid waiver where "based on [the officers'] *observations and conversations* with the [suspect], they believed he did comprehend the effect of his waiver and the rights involved"); *State v. Hall*, 48 Ohio St.2d 325, 333 (1976) (finding valid waiver where the suspect "*appeared* to be calm and intelligent" and did not "*manifest any conduct* which could be construed as a misapprehension of his rights"), *vacated in part on other grounds*, 438 U.S. 910, 98 S.Ct. 3134 (1978); *State v. Parker*, 44 Ohio St.2d 172, 176 (1975) ("[S]ubmission to interrogation after a refusal to sign a waiver may not, itself, constitute sufficiently contradictory conduct by an accused *to alert the interrogating officer* that the accused misapprehended the explanation of his rights * * *."). Such a focus is especially appropriate in the context of Fifth Amendment protections since Fifth Amendment jurisprudence often revolves around objective determinations, as opposed to the subjective beliefs of the

suspect. *E.g.*, *State v. Knuckles*, 65 Ohio St.3d 494, 495 (1992) ("Any statement, question or remark which is '*reasonably* likely to elicit an incriminating response' is an interrogation."), quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682 (1980); *State v. Graham*, 12th Dist. Nos. CA2010-10-016, CA2010-10-017, CA2010-10-018, CA2010-10-019, CA2010-10-020, 2012-Ohio-138, ¶ 48 (stating that in determining whether a custodial interrogation occurred, "there must be an *objectively reasonable* belief by the defendant that he is in custody").

{¶27} With these principles in mind, we now turn to Kirk's purported waiver of his *Miranda* rights.

*Voluntariness of Kirk's Waiver*

{¶28} Coercive police activity during the course of an interrogation is a necessary predicate for finding that a suspect's *Miranda* waiver was involuntary. *See Connelly* at 170 ("The voluntariness of a waiver * * * has always depended on the absence of police overreaching * * *."); *State v. Getsy*, 84 Ohio St.3d 180, 189 (1998) ("Evidence of use of an inherently coercive tactic (e.g., physical abuse, threats, deprivation of food, medical treatment, or sleep) triggers the totality-of-the-circumstances analysis."). Here, the record contains no evidence that Officer

Clark used coercive tactics while interrogating Kirk.[3]  Dr. McGregor explicitly

testified that no such tactics were used in the interrogation.  The video recording

of the interrogation confirms Dr. McGregor's testimony.  Due to the lack of

evidence showing police coercion, the trial court erred in finding that Kirk's

waiver of his *Miranda* rights was involuntary.[4]

### *The Knowing and Intelligent Nature of Kirk's Waiver*

{¶29} Since Kirk's waiver was voluntary, we must consider whether it was

also knowing and intelligent.[5]  When assessing the knowing and intelligent nature

of a *Miranda* waiver, a suspect's signed waiver form is "strong proof" of its

validity.  *State v. Moore*, 81 Ohio St.3d 22, 32 (1998), citing *North Carolina v.*

*Butler*, 441 U.S. 369, 374-75, 98 S.Ct. 1755 (1979).  Further, "an individual's low

intellect does not necessarily render him or her incapable of waiving *Miranda*

---

[3] Kirk claims in his appellate brief that he has never challenged the voluntary nature of his waiver.  He also asserts that Dr. McGregor opined that the waiver was voluntary.  However, the record contradicts both of these claims.  In his motion to suppress, Kirk argued that his waiver was involuntary.  Further, Dr. McGregor testified that Kirk's waiver was involuntary because his cognitive defects precluded a voluntary waiver.  While Kirk does not question the voluntariness of his waiver on appeal, we are compelled to address the issue based on this evidence in the record and the trial court's finding that the waiver was involuntary.

[4] The trial court relied on Dr. McGregor's opinion in finding that Kirk's waiver was involuntary.  Such reliance was misplaced since Dr. McGregor's opinion was not based on the legal standard for voluntariness.  Rather, it was based on Dr. McGregor's erroneous belief that voluntariness, for *Miranda* purposes, is necessarily absent where a suspect is unable to knowingly and intelligently waive his rights.  This belief is plainly contrary to *Moran*'s separation of issues relating to voluntariness from issues relating to the suspect's ability to comprehend and waive his rights.  As a result, its presence in Dr. McGregor's analysis renders his opinion regarding the voluntary nature of Kirk's waiver unpersuasive.

[5] Although the State challenges the trial court's finding that Kirk's waiver was not voluntary, knowing, and intelligent, it focuses almost exclusively on the voluntariness aspect of the waiver.  Such exclusive focus is inappropriate in light of *Moran*'s requirement that trial courts consider voluntariness separately from the knowing and intelligent nature of the waiver.  *See State v. Clemens*, 7th Dist. No. 99-JE-18 (Mar. 23, 2001) (affirming suppression of the suspect's police statement where the State "inordinately focused its argument on the voluntariness of [the suspect's] waiver of rights").

rights." *State v. Lynn*, 7th Dist. No. 11 BE 18, 2011-Ohio-6404, ¶ 14. In fact, courts have previously found valid *Miranda* waivers where the suspects had comparable IQs to Kirk's and even lower reading levels. *E.g.*, *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995) (finding that suspect with IQ of 78 gave valid waiver since he received warnings both while in custody and for prior crimes); *Jenkins*, 15 Ohio St.3d at 233 (finding valid waiver where the suspect had a low IQ); *State v. Edwards*, 49 Ohio St.2d 31, 39 (1976) (finding that the suspect's waiver was intelligent even though the suspect had a low IQ and second-grade reading level), *vacated in part on other grounds*, 438 U.S. 911, 98 S.Ct. 3147 (1978); *State v. Lail*, 2d Dist. No. 24118, 2011-Ohio-2312, ¶ 23 (finding that suspect with IQ in the mild retardation range knowingly and intelligently waived *Miranda* rights); *In re N.J.M.*, 12th Dist. No. CA 2010-03-026, 2010-Ohio-5526, ¶ 30 (finding no *Miranda* violation where the suspect with an IQ of 67 gave confession); *State v. Howell*, 4th Dist. No. 97 CA 636 (Dec. 16, 1997) (finding that the suspect's waiver was intelligent even though the suspect had a third-grade reading level); *State v. Collins*, 11th Dist. No. 95-A-0044 (Dec. 20, 1996) (finding that the suspect's waiver was knowing and intelligent where the suspect had an IQ of 76 and a fourth-grade reading level).

{¶30} Such findings are appropriate because the suspect's intelligence level is not, by itself, dispositive. Rather, the suspect's intelligence must be considered

in light of the interrogation's other circumstances, including the suspect's own conduct and representations during the interrogation. *See Garner*, 557 F.3d at 264 ("It is well-established * * * that mental capacity is one of many factors to be considered in the totality of the circumstances analysis regarding whether a *Miranda* waiver was knowing and intelligent. Thus, diminished mental capacity alone does not prevent a defendant from validly waiving his or her *Miranda* rights."); *Jenkins* at 233 (stating that the suspect's intelligence is merely "one factor" in the assessment of a *Miranda* waiver's validity). After considering all of the interrogation's circumstances, we decide not whether the "suspect [knew] and [understood] every possible consequence of [his] waiver" but whether the "suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851 (1987).

{¶31} The decision of the United States Court of Appeals for the Sixth Circuit in *Garner* provides significant guidance to this matter. There, the defendant "appeared perfectly normal and very coherent" when he signed a waiver of his *Miranda* rights. *Garner* at 261. The court further described the giving of the *Miranda* warnings as follows:

> [T]he police officers took care to ensure that [the suspect]
> understood the warnings and waiver before he signed the form. * *
> * [A]fter reading each provision of the *Miranda* warnings to [the

suspect], [the interrogating officer] asked [the suspect] if he understood the meaning of that provision. Each time that he was asked, [the suspect] responded that he understood his rights, including the waiver provision. Further, nothing in the record indicates that [the suspect] verbally expressed a misunderstanding to police officers or otherwise engaged in conduct indicative of a misunderstanding. *Id.*

Based on these circumstances, as well as the suspect's ability to comprehend the criminality of his actions, the court found that the suspect knowingly and intelligently waived his *Miranda* rights. *Id.* at 262.

{¶32} In reaching this conclusion, the Sixth Circuit discounted the expert testimony offered by the suspect indicating that he was of "borderline intelligence," and had an "abusive and socially depraved background" that included "a long history of hyperactivity and impulsivity." *Id.* at 263. It also rejected expert testimony that relied on results gleaned from the administration of Grisso tests. *Id.* at 264. According to the court, the suspect's "conduct, speech, and appearance at the time of interrogation" had primacy over "his diminished mental capacity," especially since "at no time did [the suspect] exhibit any outwardly observable indications that he did not understand the warnings or the circumstances surrounding his interrogation." *Id.* at 265-66.

{¶33} The facts of this matter are markedly similar to those addressed in *Garner*. Like the interrogating officer in *Garner*, Officer Clark read each *Miranda* right and the waiver provision separately to Kirk. After each separate provision

was read, Officer Clark asked Kirk whether he understood the right. Upon hearing the *Miranda* rights and indicating that he understood them, Kirk signed the waiver form. *See United States v. Male Juvenile*, 121 F.3d 34, 40 (2d Cir. 1997) (finding that suspect knowingly and intelligently waived his rights even though he had learning disabilities since he told the interrogating officers that he understood his rights). Officer Clark even took additional steps to ensure that Kirk was capable of understanding the rights that he waived by asking Kirk about his age, level of education, and ability to read and write.[6]

{¶34} During the subsequent interrogation, Kirk, like the suspect in *Garner*, displayed no outward signs that he was of diminished mental capacity. Rather, as indicated by Officer Clark's testimony at the suppression hearing, Kirk's conduct was reflective of a normal 18-year old man as opposed to a feeble-minded person with limited cognitive skills. *See United States v. Rosario-Diaz*, 202 F.3d 54, 69 (1st Cir. 2000) (finding that suspect with low IQ knowingly and intelligently waived rights where the interrogating officers testified that the suspect understood the questions and her rights). He admitted that his alleged sexual activity with E.E. was wrong and "messed up [his] life pretty much."

---

[6] The manner in which Officer Clark read the *Miranda* warnings and his additional questioning regarding Kirk's age, education level, and literacy suggests that Officer Clark made at least a minimal attempt to determine whether Kirk understood his rights. As a result, the trial court's finding that Officer Clark made no attempt to determine Kirk's ability to understand his rights is not supported by some credible, competent evidence and is clearly erroneous.

Interview Tr., p. 31. Kirk also told Dr. McGregor that during the interrogation he thought that he was "screwed." Hearing Tr., p. 424. This evidence shows that Kirk had the "capacity to understand the criminal nature of his actions," which suggests that he "also had the capacity to understand and appreciate the consequences of speaking to police about his criminal conduct." *Garner*, 557 F.3d at 261; *see also United States v. Shields*, 480 Fed.Appx. 381, 389 (6th Cir. 2012) (finding that mentally retarded suspect validly waived *Miranda* rights since his "cooperativeness and coherency * * * demonstrate that he grasped both the nature of the charges against him and the consequences that could flow from his interactions with police").

{¶35} The State also introduced evidence that Kirk has previous experience with the criminal justice system, indicating that he understood police interrogation, the courts, and his rights. *See United States v. Cristobal*, 293 F.3d 134, 142 (4th Cir. 2002) (finding that the suspect knowingly and intelligently waived his rights where evidence showed that he had been Mirandized on at least one previous occasion). A police officer questioned Kirk regarding the laundromat incident and had him sign a *Miranda* waiver form that had the exact same format as the one Kirk signed here. After admitting to his role in damaging the property, Kirk went through the juvenile system, which included an appearance before a magistrate with the juvenile court.

**{¶36}** In light of the above circumstances and *Garner*'s guidance, we find that Kirk knowingly and intelligently waived his *Miranda* rights. *See also Smith v. Mullin*, 379 F.3d 919, 932-34 (10th Cir. 2004) (finding that mentally retarded suspect knowingly and intelligently waived his rights where he stated that he understood the *Miranda* advisement and had previous experience in the criminal justice system); *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998) (finding that suspect with borderline IQ gave a valid *Miranda* waiver since he "was cooperative, reviewed and initialed each admonition of the waiver form, agreed to answer questions, and gave accurate information").

*Kirk's Arguments*

**{¶37}** To support suppression, Kirk relies on the following: (1) Officer Clark's rapid reading of the *Miranda* rights; (2) Kirk's conduct during the interrogation purportedly suggesting that he had cognitive limitations and could not understand his rights; (3) Dr. McGregor's expert testimony and other lay testimony regarding Kirk's cognitive limitations. We find that none of these items militate towards suppression.

**{¶38}** The video recording of the police interrogation does reveal that Officer Clark read Kirk's *Miranda* rights quickly. However, it does not reveal that Officer Clark read the rights so quickly that Kirk was unable to understand him. In fact, Kirk twice said, in no uncertain terms, that he understood his rights.

*Compare In re T.F.*, 9th Dist. No. 08CA009449, 2009-Ohio-3141, ¶ 24 (finding that waiver was not knowing and intelligent where the police officer read *Miranda* warning rapidly and failed to repeat them after the suspect indicated he did not understand his rights). Further, since Officer Clark stopped after each right to ask Kirk whether he understood, Kirk had ample opportunities to ask Officer Clark to repeat himself if he was unable to follow Officer Clark's pace.[7] As such, the import of Officer Clark's rapid reading of the *Miranda* rights is limited.

{¶39} Moreover, the video recording does not indicate that Kirk's conduct during the interrogation alerted Officer Clark that he suffered from cognitive limitations. While at various intervals during the interrogation, Kirk intensely blinked, fidgeted in his seat, and looked off into the distance, none of his actions would suggest that he had a low IQ or a reduced ability to understand the seriousness of the situation. Indeed, Kirk's overall calm demeanor, straightforward discussion of his alleged sexual activity with E.E., and acknowledgment that it was wrong suggested that he was of normal intelligence.[8]

---

[7] Kirk elicited testimony at the suppression hearing that he has a tendency to feign that he understands words so that he is not exposed as a person with limited cognitive abilities. However, during the course of the interrogation, he was perfectly willing on two occasions to tell Officer Clark that he did not understand the formal terms Officer Clark was using regarding his alleged sexual activities with E.E. Kirk's willingness to express his lack of understanding during the interrogation tends to discredit the above testimony. It also suggests that had Kirk truly not understood Officer Clark's rapid reading of the *Miranda* rights and waiver, he would have stopped Officer Clark as he did at other times during the interrogation.

[8] Kirk also suggests that his lack of familiarity with the terms "ejaculation" and "intercourse" supports his position that his cognitive limitations were demonstrated during the interrogation. While Kirk did express lack of familiarity with these terms, Officer Clark then rephrased his questions by using more commonly known synonyms. After asking the rephrased questions, Kirk indicated that he understood and answered.

Based on this, we do not find that Kirk's conduct during the interrogation suggested to Officer Clark that he was unable to understand and waive his rights.

{¶40} Finally, the testimony offered at the hearing regarding Kirk's cognitive limitations does not mandate suppression. While Kirk does have a history of cognitive limitations, he did not manifest them, or an inability to understand his rights, during the course of the interrogation. As noted above, this fact is critical, not the mere existence of the limitations.[9]

{¶41} Further, Dr. McGregor's expert testimony suffers from several glaring flaws that render it unpersuasive. The Grisso tests that Dr. McGregor administered used more complex language than the language contained in the *Miranda* warning given by Officer Clark. Once Dr. McGregor read the warning given by Officer Clark, Kirk indicated that he understood what a lawyer was and that one would be appointed for him if he could not afford a lawyer. Additionally, Kirk indicated that he understood the adversarial nature of the interrogation and that the police could use his statements against him in court. Dr. McGregor also admitted that the Grisso tests contain a subjective element.

---

[9] The trial court heavily relied on the expert and lay testimony regarding Kirk's cognitive limitations to find that he was unable to voluntarily, knowingly, and intelligently waive his rights. However, in light of the objective nature of our inquiry, such heavy reliance, without close scrutiny of Kirk's and Officer Clark's conduct during the interrogation, is misplaced. Further, as the trial court noted, police officers "are not required to know the actual mental ability or mindset of a suspect." (Docket No. 29, p. 7). Suppressing Kirk's statements from a police interrogation in which he gave no outward sign of his cognitive limitations would derogate this well-settled law.

{¶42} The most evident flaw of Dr. McGregor's testimony came on redirect examination. He stated that the Grisso tests "are not a legal determination by any stretch of the imagination of capacity to waive [*Miranda* rights]." Hearing Tr., p. 443. Dr. McGregor's discrediting of the very tests on which he relied in reaching his conclusions significantly reduces the weight of his testimony.

{¶43} In sum, Dr. McGregor acknowledged that Kirk understands three of the four *Miranda* rights. He also discredited the Grisso tests, which were the central bases for his conclusions, as subjective and not producing a legal determination of an individual's ability to waive his *Miranda* rights. Based on these flaws, we are unable to find that Dr. McGregor's testimony requires suppression of Kirk's statements. *See Garner*, 557 F.3d at 269-70 (rejecting expert testimony relying on Grisso test results and outlining common deficiencies in the administration of Grisso tests); *Murphy v. Ohio*, 551 F.3d 485, 515 (6th Cir. 2009) (stating that the reliability of Grisso tests have yet to be established); *People v. Hernandez*, 46 A.D.3d 574, 576, 846 N.Y.S.2d 371 (App. Div. 2007) (noting that Grisso tests "have not been generally accepted").

{¶44} It is apparent from Officer Clark's conduct that this matter does not present a situation where the police engaged in the type of abuses with which *Miranda* is concerned. *Compare Cooper v. Griffin*, 455 F.2d 1142, 1143 (5th Cir. 1972) (finding that the suspect's waiver was invalid under *Miranda* where the

police questioned him while he was suffering from gunshot wound and the police did not offer medical assistance). Nor does this matter present a scenario in which the suspect manifested clear signals that he was unable to comprehend his rights during the interrogation. *Compare Rice*, 148 F.3d at 750 ("It is different, if perhaps only be a shade, if the police question [a suspect] knowing that he does not understand his rights."); *United States v. Garibay*, 143 F.3d 534, 539 (9th Cir. 1998) (finding that statement was not knowingly and intelligently made where the suspect "did not appear to understand" the questions). Rather, all the circumstances of the interrogation in this matter, taken together, demonstrate that Kirk was properly advised of his rights and that he was capable of both understanding and waiving them. As such, the trial court's finding that Kirk did not knowingly and intelligently waive his right was erroneous.

{¶45} Since Kirk voluntarily, knowingly, and intelligently waived his *Miranda* rights, we find that the trial court erred in granting Kirk's motion to suppress.

{¶46} Accordingly, we sustain the State's second assignment of error.

*Assignment of Error No. I*

{¶47} In its first assignment of error, the State argues that the trial court erred in granting Kirk's motion to suppress since Kirk was not subject to custodial interrogation during the police interview. Our resolution of the State's second

-30-

assignment of error renders this assignment of error moot and we decline to address it. *See* App.R. 12(A)(1)(c).

{¶48} Having found error prejudicial to the State in the second assignment of error, we reverse the trial court's judgment and remand this matter for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**PRESTON, P.J. and SHAW, J., concur.**

**/jlr**